Andrew Zollinger, State Bar No. 24063944
andrew.zollinger@dlapiper.com
DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201-4629
Telephone: (214) 743-4500
Facsimile: (214) 743-4545

PROPOSED COUNSEL FOR THE DEBTORS

Thomas R. Califano (*pro hac vice admission pending*)
Dienna Corrado (*pro hac vice admission pending*)
thomas.califano@dlapiper.com
dienna.corrado@dlapiper.com
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York  10020-1104
Telephone:  (212) 335-4500
Facsimile:  (212) 335-4501

Daniel M. Simon (*pro hac vice admission pending*)
daniel.simon@dlapiper.com
DLA Piper LLP (US)
One Atlantic Center
1201 West Peachtree Street, Suite 2800
Atlanta, Georgia 30309
Telephone:  (404) 736-7800
Facsimile:  (404) 682-7800

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| | § | |
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| 4 West Holdings, Inc. *et al.*,[1] | § | Case No. 18-30777 |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | |
| | § | |

**DEBTORS' MOTION (I) PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364 AUTHORIZING THE DEBTORS TO (A) OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (B) GRANT LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (C) USE CASH COLLATERAL OF PREPETITION SECURED PARTIES, AND (D) GRANT ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c); AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors (collectively, the "Debtors"), by and through their proposed

---

[1]     A list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, is attached hereto as Exhibit A.

counsel, DLA Piper LLP (US), hereby submit this Motion (I) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing, (B) Grant Liens and Superpriority Administrative Expense Status, (C) Use Cash Collateral of Prepetition Secured Parties, and (D) Grant Adequate Protection to Prepetition Secured Parties; (II) Scheduling a Final Hearing Pursuant To Bankruptcy Rules 4001(B), and (III) Granting Related Relief (the "DIP Financing Motion").   In support of the DIP Financing Motion, the Debtors rely upon, and incorporate by reference, the *Declaration of Louis E. Robichaux IV in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"),[2] filed with the Court contemporaneously herewith.   In further support of the DIP Financing Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.       The Court has jurisdiction over the Debtors, their estates, and this matter under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2).

2.       Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

3.       The statutory bases for the relief requested herein are Sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 4001, 6004, 9013, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Appendix H to the Local Bankruptcy Rules (the "Local Rules").

---

[2]        Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

## PRELIMINARY STATEMENT

4.      In the ordinary course of business, the Debtors require cash on hand and cash flow from their operations to fund their working capital and liquidity needs.  In addition, the Debtors require cash on hand to fund these Chapter 11 Cases.  The Debtors' use of Cash Collateral (as defined below), as well as the postpetition financing, is necessary in order for the Debtors to preserve sufficient liquidity to maintain ongoing day-to-day operations and fund their working capital needs.  Absent postpetition financing, the Debtors will be forced to cease operations of their businesses, thereby jeopardizing their ability to maximize the value of their estates.  Such an abrupt cessation of the Debtors' businesses would have devastating effects on the residents receiving services at the Debtors' facilities, leaving many without the health and support services that they require.  Due to the nature of the Debtors' businesses, it is imperative that the Debtors have sufficient working capital and liquidity to preserve and maintain their going concern value.

5.      Additionally, certain of the Debtors' deposit accounts, cash and cash proceeds are encumbered by security interests in favor of one or more prepetition secured lenders described below and, as such, constitute "cash collateral" (as such term is defined in Bankruptcy Code section 363(a), "Cash Collateral") of such lenders.  The Debtors have an emergency need for the immediate use of Cash Collateral to effectively and expeditiously manage these Chapter 11 Cases.

6.      The Debtors require immediate authority to obtain post-petition financing so as to provide sufficient liquidity to continue their operations in an orderly manner on a post-petition basis.  The Debtors will use the Term Loan to repay the Sterling Obligations (as defined below) (the "Sterling Payoff") on the date of the closing of the DIP Facility in accordance with the

3

Payoff Letter (the "Payoff Letter"), substantially in the form attached hereto as Exhibit B, and to borrow enough funds under the Revolving Loans to operate in the ordinary course of business during these bankruptcy cases, all with the ultimate goal of effectuating the transactions and Debtors' obligations set forth in the Restructuring Support Agreement, and to effectuate the Debtors' reorganization.

7.     In doing so, and after careful evaluation and further negotiations with the Debtors' primary stakeholders, the Debtors are seeking authority to execute the *Senior Secured Super-Priority Debtor-in-Possession Credit Agreement* (the "DIP Credit Agreement") in substantially the same form as the agreement attached hereto as Exhibit C.[3] The Debtors have negotiated the DIP Credit Agreement with OHI Asset RO, LLC, a Maryland corporation (together with any other lender parties thereto, the "DIP Lender"), a prepetition secured lender to the Debtors. In connection with the DIP Credit Agreement, all obligations and liabilities under the DIP Credit Agreement shall at all times:

(a)     pursuant to Section 364(c)(1) of the Bankruptcy Code, constitute allowed superpriority administrative expense claims against each Debtor which is a party thereto, on a joint and several basis, *pari passu* with any superpriority administrative expense claims granted to the Sterling Parties and senior to and with priority in payment over all other administrative expenses and any other claims against such Debtors or their estates in the Chapter 11 Cases (and any subsequent Chapter 7 cases to which they are converted);

(b)     pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by valid, binding, continuing, enforceable, non-avoidable, automatically and properly perfected first priority liens on and security interests in all DIP Collateral that is not otherwise subject to the Prepetition Liens or any Permitted Prior Liens;

(c)     pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by valid, binding, continuing, enforceable, non-avoidable, automatically and

---

[3]     Capitalized terms not defined in the First Day Declaration or otherwise in this DIP Financing Motion shall carry the meaning ascribed to such term in the DIP Credit Agreement and Interim Order.

properly perfected junior liens on and security interests in all DIP Collateral that is subject to any Permitted Prior Liens, which junior liens and security interests in favor of the DIP Lender shall be subject only to any such Permitted Prior Liens;

(d) pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by valid, binding, continuing, enforceable, non-avoidable, automatically and properly perfected first priority senior priming liens on and security interests in all DIP Collateral securing the "Prepetition Obligations" (as defined in the Interim Order), which senior priming liens and security interests in favor of the DIP Lender shall be subject only to any Permitted Prior Liens on such DIP Collateral.

## BACKGROUND

8.     On the date hereof (the "Petition Date"), each Debtor filed with this Court a voluntary petition for relief under the Bankruptcy Code).

9.     The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or official committee of unsecured creditors has been appointed in the Debtors' chapter 11 cases (the "Chapter 11 Cases").

10.     Additional information regarding the Debtors and these Chapter 11 Cases, including the Debtors' business operations, capital structure, financial condition, and the reasons for and objectives of these Chapter 11 Cases, is set forth in the First Day Declaration.

**I.     Prepetition Debt Structure**.

**A.     Sterling Facility.**

11.     On March 1, 2016, certain of the Operating Debtors described in the First Day Declaration (the "Sterling Borrowers") entered into a Revolving Loan and Security Agreement, dated as of March 1, 2016 (as amended from time to time, and together with all related documents and exhibits thereto, the "Sterling Agreement") with Sterling National Bank, as "Administrative Agent" and "Collateral Agent" ("Sterling Agent"), and certain other lenders

5

party thereto (collectively with Sterling, the "Sterling Parties"). Pursuant to the Sterling Agreement, the Sterling Parties provided a $30 million, three-year revolving credit facility (the "Sterling Facility"). As of the Petition Date, the outstanding balance owed under the Sterling Facility is approximately $14,216,459.08 (such principal amount, together with all other amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Sterling Credit Facility, (the "Sterling Obligations").

12. To secure the repayment of the Sterling Obligations, the Sterling Borrowers granted the Sterling Parties a first priority perfected security interest and lien on the following (the "Sterling Borrower Liens"):[4] (a) all Receivables, (b) to the maximum extent permitted by law, all deposit accounts of such Sterling Borrowers subject to a Depository or Account Control Agreement ("DACA"), including, without limitation, each Lockbox and each Lockbox Account, and amounts held therein, (c) all money and cash, including all cash collateral, in a deposit account subject to a DACA, including, without limitation, all Collections, (d) all general intangibles and payment intangibles, and any other rights to payment of every kind and description, and any contract rights, chattel paper, documents and instruments relating to the Receivables and all of such Sterling Borrowers' rights and remedies with respect to the Receivables (including the creation, enforcement and collection of the Receivables) or the obligation of any Obligor with respect thereto, (e) all Records relating to the Sterling Borrowers' Receivables and the other items in (a) through (d) above; (f) and all proceeds of any kind or nature of the foregoing (collectively, the "Sterling Collateral").

---

[4] Capitalized terms not otherwise defined in this paragraph shall have the meanings ascribed to such terms in the Sterling Agreement.

13.     Certain of the Debtors (the "Sterling Guarantors")[5] guaranteed the Sterling Borrowers' obligations under the Sterling Agreement pursuant to a Guaranty and Security Agreement, dated March 1, 2016 (the "Guaranty").  Under the Guaranty, the Sterling Guarantors granted the Sterling Parties a security interests in and liens on (together with the Sterling Borrower Liens, the "Sterling Liens") the following (the "Guarantor Collateral"):

(a)     to the maximum extent permitted by law, all deposit accounts of such Sterling Guarantors into which any Collections are directly or indirectly swept and which are subject (or required pursuant to the terms hereof to be subject) to a DACA, including, without limitation, each concentration account and controlled disbursement account listed in Schedule III to the Loan Agreement, as such Schedule III may be amended from time to time, and amounts held therein;

(b)     all money and cash, including all cash collateral, in a deposit account into which any Collections are directly or indirectly swept and which are subject (or required pursuant to the terms hereof to be subject) to a DACA, including, without limitation, all Collections swept into any such account;

(c)     all Records relating to the items in (a) and (b) above; and

(d)     all proceeds of any kind or nature of the foregoing.

14.     The Sterling Borrowers and Sterling Guarantors established lock box accounts at The PrivateBank and Trust Company for the deposit of all receivables, which are subject to Sterling Liens.  Sterling sweeps all cash from the Sterling Borrowers' operating accounts on a daily basis.

15.     On October 11, 2016, the Sterling Agent issued a notice of default under the Sterling Facility (the "October Notice"), identifying certain covenant defaults under the Sterling Agreement and defaults under the Master Leases.  The October Notice, among other things,

---

[5]     The Guarantors of the Sterling Facility are: Debtors 4 West Holdings, Inc., New Ark Investment, Inc., Covenant Dove Holding Company, LLC (n/k/a Orianna Health Systems, LLC), Covenant Dove, LLC (n/k/a Orianna Health Systems, LLC), Ark Mississippi Holding Company, LLC, Olive Leaf Holding Company, LLC, Olive Leaf, LLC and Ark South Carolina Holding Company, LLC, Ark SC Operator Holdings, Inc., and New Ark Operator Holdings, LLC.

further stated that the Sterling Parties had not elected to exercise any rights or remedies on account of the existing events of default, other than to request funds in the Lockbox Accounts of the Sterling Borrowers be directed to Sterling Agent, and to charge a collateral monitoring fee of 0.50%.

16.     On February 7, 2017, Sterling Agent issued a second notice of default and reservation of rights (the "February 2017 Notice") stating that all events of default referenced in the October Notice are continuing.  The February 2017 Notice further stated that the lessees under the Master Lease Documents (as defined below) had failed to make payments for January 2017 and February 2017 and that as a result, additional events of default were then existing under the Sterling Facility.  The February 2017 Notice also stated that as long as the Master Lease Landlords (as defined below) agreed to waive the default under the Master Leases and related subleases, the Sterling Parties would continue to consider each request for a discretionary advance as set forth in the October Notice.

17.     On February 22, 2018, Sterling Agent issued a third notice of default and reservation of rights (the "February 2018 Notice") stating that all events of default referenced in the prior notices were then continuing.  The February 2018 Notice stated that default interest will accrue and further Revolving Advances, if any, were to be funded at the sole discretion of the Sterling Parties.

**B.     Master Leases.**

18.     Certain of the Debtors are party to Master Leases with affiliates of Omega Healthcare Investors, Inc., a publicly traded real estate investment trust that invests in SNFs and assisted living facilities in the United States and United Kingdom (collectively with its affiliates and subsidiaries, the "Omega Parties").  As of the Petition Date, the Master Lease Debtors (as

8

defined below) have entered into the following Master Leases and related documents with certain Omega Parties (each, a "Master Lease Document" and collectively, the "Master Lease Documents"):

    (a)    SE Master Lease

        i.  Master Lease Agreement (South East Region) dated as of November 27, 2013 (as amended, restated, supplemented, or otherwise modified from time to time, the "SE Master Lease"), by and among the Debtors identified on Schedule 1 thereto as "Tenants" (the "SE Master Lease Tenants") and the Omega Parties identified on Schedule 1 thereto as "Landlords (the "SE Master Lease Landlords"), the SE Master Lease Landlords lease the "Leased Property" (as defined in the SE Master Lease) (the "SE Leased Property") to the SE Master Lease Tenants";

       ii.  Guaranty of Obligations (South East Region) dated as of November 27, 2013 (as amended, restated, supplemented, or otherwise modified from time to time, the "SE Master Lease Guaranty"), by and among the Debtors identified on Schedules A-1 and A-2 thereof (the "SE Master Lease Guarantors" and, together with the SE Master Lease Tenants, the "SE Master Lease Debtors") and the SE Master Lease Landlords, the SE Master Lease Guarantors guaranteed, among other things, the payment and performance of all amounts owing under the SE Master Lease and all "Obligor Group Obligations" (as defined therein);

    (b)    IN Master Lease

        i.  Master Lease Agreement (Indiana Region) dated as of November 27, 2013 (as amended, restated, supplemented, or otherwise modified from time to time, the "IN Master Lease"), by and among the Debtors identified on Schedule 1 thereto as "Tenants" (the "IN Master Lease Tenants") and the Omega Parties identified on Schedule 1 thereto as "Landlords (the "IN Master Lease Landlords"), the Master Lease Landlords lease the "Leased Property" (as defined in the IN Master Lease) (the "IN Leased Property") to the IN Master Lease Tenants;

       ii.  Guaranty of Obligations (Indiana Region) dated as of November 27, 2013 (as amended, restated, supplemented, or otherwise modified from time to time, the "IN Master Lease Guaranty"), by and among the Debtors identified on Schedules A-1 and A-2 thereof (the "IN Master Lease Guarantors" and, together with the IN Master Lease Tenants, the "IN Master Lease Debtors") and the IN Master Lease Landlords, the IN Master Lease Guarantors guaranteed, among other things, the

payment and performance of all amounts owing under the IN Master Lease and all "Obligor Group Obligations" (as defined therein);

(c)     Laurel Baye Master Lease[6]

i.  Master Lease Agreement dated as of June 27, 2014 (as amended, restated, supplemented, or otherwise modified from time to time, the "Laurel Baye Master Lease"), by and among Debtor New Ark Master Tenant, LLC (the "Laurel Baye Master Lease Tenant") and the Omega Parties identified on Schedule 1 thereto as "Landlords (the "Laurel Baye Master Lease Landlords"), the Laurel Baye Master Lease Landlords lease the "Leased Property" (as defined in the Laurel Baye Master Lease) (the "Laurel Baye Leased Property") to the Laurel Baye Master Lease Tenant;

ii. Guaranty of Obligations (Orangeburg, SC, Greenville, SC and Macon, GA) dated as of June 27, 2013 (as amended, restated, supplemented, or otherwise modified from time to time, the "Laurel Baye Master Lease Guaranty"), by and among the Debtors identified on Schedules A-1 and A-2 thereof (the "Laurel Baye Master Lease Guarantors" and, together with the Laurel Baye Master Lease Tenants, the "Laurel Baye Master Lease Debtors") and the Laurel Baye Master Lease Landlords, the Laurel Baye Master Lease Guarantors guaranteed, among other things, the payment and performance of all amounts owing under the Laurel Baye Master Lease and all "Obligor Group Obligations" (as defined therein).

(d)     NW Master Lease

i.  Master Lease Agreement (North West Region) dated as of November 27, 2013 (as amended, restated, supplemented, or otherwise modified from time to time, the "NW Master Lease"), by and among the Debtors identified on Schedule 1 thereto as "Tenants" (the "NW Master Lease Tenants") and the Omega Parties identified on Schedule 1 thereto as "Landlords (the "NW Master Lease Landlords"), the NW Master Lease Landlords previously leased the "Leased Property" (as defined in the NW Master Lease) (the "NW Leased Property") to the NW Master Lease Tenants;

ii. Guaranty of Obligations (North West Region) dated as of November 27, 2013 (as amended, restated, supplemented, or otherwise modified from time to time, the "NW Master Lease Guaranty"), by and among the Debtors identified on Schedules A-1 and A-2 thereof (the "NW Master Lease Guarantors" and, together with the NW Master Lease

---

[6] The Laurel Baye Master Lease is sometimes referred to as the "SC/GA Master Lease."

Tenants, the "NW Master Lease Debtors") and the NW Master Lease Landlords, the NW Master Lease Guarantors guaranteed, among other things, the payment and performance of all amounts owing under the NW Master Lease and all "Obligor Group Obligations" (as defined therein);

(e)     TX Master Lease

i.  Master Lease Agreement (Texas Region) dated as of November 27, 2013 (as amended, restated, supplemented, or otherwise modified from time to time, the "TX Master Lease" and together with the NW Master Lease, Laurel Baye Master Lease, IN Master Lease, and SE Master Lease, the "Master Leases" and each a "Master Lease"), by and among the Debtors identified on Schedule 1 thereto as "Tenants" (the "TX Master Lease Tenants") and the Omega Parties identified on Schedule 1 thereto as "Landlords (the "TX Master Lease Landlords" and, together with the SE Master Lease Landlords, the IN Master Lease Landlords, the Laurel Baye Master Lease Landlords, and the NW Master Lease Landlords, the "Master Lease Landlords"), the TX Master Lease Landlords previously leased the "Leased Property" (as defined in the TX Master Lease) (the "TX Leased Property" and, together with the SE Leased Property, the IN Leased Property, the Laurel Baye Leased Property, and the NW Leased Property, the "Leased Property") to the TX Master Lease Tenants;

ii.  Guaranty of Obligations (Texas Region) dated as of November 27, 2013 (as amended, restated, supplemented, or otherwise modified from time to time, the "TX Master Lease Guaranty"), by and among the Debtors identified on Schedules A-1 and A-2 thereof (the "TX Master Lease Guarantors" and, together with the TX Master Lease Tenants, the "TX Master Lease Debtors" and, together with the SE Master Lease Debtors, the IN Master Lease Debtors, the Laurel Baye Master Lease Debtors, and the NW Master Lease Debtors, the "Master Lease Debtors") and the TX Master Lease Landlords, the TX Master Lease Guarantors guaranteed, among other things, the payment and performance of all amounts owing under the TX Master Lease and all "Obligor Group Obligations" (as defined therein); and

iii.  Termination of Prime Lease and Master Sublease (9 Texas Facilities) dated as of July 1, 2017 (the "TX Master Lease Termination"), by and among the TX Master Lease Landlords, the TX Master Lease Tenants, the TX Master Lease Guarantors, and the parties identified as "Subtenants" and "Sublease Guarantors" therein, the parties agreed, among other things, (a) to terminate the TX Master Lease, and (b) that the TX Master Lease Tenants would pay the "Security Deposit" to the TX Master Lease Landlord in the amount of $1,250,000.

19. As of the Petition Date, the aggregate amount of "Rent" and "Impositions" due and owing under the Master Lease Documents is as follows (collectively, the "Master Lease Obligations"):

(a) SE Master Lease: not less than $43,747,162.69 (together with all other amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the SE Master Lease, the SE Master Lease Guaranty, all other "Lease Documents" (as defined in the SE Master Lease), and any other related agreements, documents, and instruments (as each may be amended, restated, supplemented, or otherwise modified from time to time, collectively, the "SE Master Lease Documents"), including, without limitation, fees, expenses, charges, amounts, costs, and obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under or in respect of any of the SE Master Lease Debtors' obligations pursuant to the SE Master Lease Documents, collectively, the "SE Master Lease Obligations");

(b) IN Master Lease:  not less than $297,871.91 (together with all other amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the IN Master Lease, the IN Master Lease Guaranty, all other "Lease Documents" (as defined in the IN Master Lease), and any other related agreements, documents, and instruments (as each may be amended, restated, supplemented, or otherwise modified from time to time, collectively, the "IN Master Lease Documents, including, without limitation, fees, expenses, charges, amounts, costs, and obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under or in respect of any of the IN Master Lease Debtors' obligations pursuant to the IN Master Lease Documents, collectively, the "IN Master Lease Obligations").

(c) Laurel Baye Master Lease:  not less than $5,043,835.29 (together with all other amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Laurel Baye Master Lease, the Laurel Baye Master Lease Guaranty, all other "Lease Documents" (as defined in the Laurel Baye Master Lease), and any other related agreements, documents, and instruments (as each may be amended, restated, supplemented, or otherwise modified from time to time, collectively, the "Laurel Baye Master Lease Documents, including, without limitation, fees, expenses, charges, amounts, costs, and obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under or in respect of any of the Laurel Baye Master Lease Debtors' obligations pursuant to the Laurel Baye Master Lease Documents, collectively, the "Laurel Baye Master Lease Obligations").

(d)    <u>NW Master Lease</u>: not less than $668,933.76 (together with all other amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the NW Master Lease, the NW Master Lease Guaranty, all other "Lease Documents" (as defined in the NW Master Lease), and any other related agreements, documents, and instruments (as each may be amended, restated, supplemented, or otherwise modified from time to time, collectively, the "<u>NW Master Lease Documents</u>, including, without limitation, fees, expenses, charges, amounts, costs, and obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under or in respect of any of the NW Master Lease Debtors' obligations pursuant to the NW Master Lease Documents, collectively, the "<u>NW Master Lease Obligations</u>").

(e)    <u>TX Master Lease</u>: $1,250,000.00 (together with all other amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the TX Master Lease, the TX Master Lease Guaranty, the TX Master Lease Termination, all other "Lease Documents" (as defined in the TX Master Lease), and any other related agreements, documents, and instruments (as each may be amended, restated, supplemented, or otherwise modified from time to time, collectively, the "<u>TX Master Lease Documents</u>"), including, without limitation, fees, expenses, charges, amounts, costs, and obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under or in respect of any of the TX Master Lease Debtors' obligations pursuant to the TX Master Lease Documents, collectively, the "<u>TX Master Lease Obligations</u>".

20.    Pursuant to Master Leases, the Master Lease Debtors (a) granted to an Omega Party, OHI Asset RO, LLC, as collateral agent (the "<u>Master Lease Agent</u>") for the benefit of the Master Lease Landlords (the Master Lease Landlords and the Master Lease Agent being referred to, collectively, as the "<u>Master Lease Parties</u>"), a security interest in all "Collateral" and "Pledged Collateral" (as defined in the Master Lease Documents), which includes substantially all assets of the Master Lease Debtors, and (b) granted to certain of the Master Lease Landlords precautionary mortgages on certain of the Leased Property. In addition, in connection with the Laurel Baye Master Lease, pursuant to the Pledge Agreement, dated  June 27, 2014, 4 West Investors, LLC pledged its equity interests in 4 West Holdings, Inc. ("<u>4 West Holdings</u>") to Master Lease Agent (all collateral securing the Master Lease Obligations described above being

13

collectively referred to herein as the "Master Lease Collateral"). Non-Debtor Health Care Navigator LLC ("HCN") also granted certain of the Omega Parties a security interest in, among other things, machinery, furniture, equipment, trade fixtures, appliances, accounts, contract rights, licenses and permits located at, arising out of the operations of, or used in connection with the Facilities.

21.     In connection with each of the Master Leases, pursuant to certain Subordination Agreements (collectively, the "Omega Intercompany Subordination Agreements"), 4 West Holdings and certain other Debtors specified in the Omega Intercompany Subordination Agreements agreed to subordinate intercompany debt to amounts owing to the Master Lease Landlords under the Master Leases.  In addition, in connection with each of the SE Master Lease and the IN Master Lease, pursuant to an Assignment, Consent and Subordination of Services Agreement, non-Debtor HCN, as consultant, agreed to subordinate any fees owed to HCN to amounts owing to the Master Lease Landlords under the SE Master Lease and IN Master Lease. Similarly, in connection with the Laurel Baye Master Lease, pursuant to an Assignment, Consent and Subordination of Services Agreement, Debtor Orianna Health Systems, LLC ("OHS"), as consultant, agreed to subordinate any fees owed to OHS to amounts owing to the Omega Landlords under the Laurel Baye Master Lease.

22.     In addition to the foregoing subordination agreements, the Master Leases are also subject to the following two intercreditor agreements:

(a)     Pursuant to the Subordination Agreement, dated November 27, 2013, between Master Lease Landlords listed on the signature page thereto and New Ark Mezz Holdings, LLC (the "Landlord/Mezz Intercreditor Agreement"), New Ark Mezz's liens and right to payment are subordinate to the liens and rights of the such Master Lease Landlords under the Master Leases.

(b)     Pursuant to the Subordination and Intercreditor Agreement, dated March 1, 2016 by and among the Sterling Borrowers, the Sterling Agent, and

14

certain Omega Parties (as amended pursuant to the First Amendment to Subordination and Intercreditor Agreement, dated May 2, 2017) (the "Sterling Intercreditor Agreement"), the Omega Parties' liens and right to payment under the Master Leases (and the Working Capital Loan Agreement (as defined below)) are subordinate to the liens and rights of the Sterling Parties under the Sterling Facility.

23.     As of the Petition Date, the Debtors owed approximately $52 million of rent to the Master Lease Landlords under the Master Leases.

### C.     Working Capital Loan Agreement.

24.     Pursuant to the Working Capital Loan Agreement, dated May 2, 2017 (the "Working Capital Loan Agreement" and together with all related agreements, documents, and instruments, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Working Capital Documents" and, together with the Master Lease Documents, the "Prepetition Documents"), OHI Asset RO, LLC, as lender (the "Working Capital Lender" and collectively with the Master Lease Parties, the "Prepetition Secured Parties"), which is an Omega Party, provided an $18.8 million line of credit to the Debtors listed as "Borrowers" on Schedule 2 thereto (the "Working Capital Debtors") for working capital expenses (the "Working Capital Loan").  Most of the proceeds of the Working Capital Loan were used by the Debtors to pay rent and real property taxes with the remainder used for other Debtor operating expenses.  As of the Petition Date, the outstanding principal balance under the Working Capital Loan Agreement is approximately $15 million (together with all other amounts incurred or accrued prior to the Petition Date, the "Working Capital Obligations").

25.     As more fully set forth in the Working Capital Documents, prior to the Petition Date, the Working Capital Debtors granted to the Working Capital Lender a security interest in and lien on (the "Working Capital Liens" and, together with the Master Lease Liens, the "Prepetition Liens") all "Collateral" under and as defined in the Working Capital Documents,

which includes substantially all assets of the Working Capital Debtors (the "Working Capital Collateral" and, together with the Master Lease Collateral, the "Prepetition Collateral") to secure repayment of the Prepetition Obligations other than the Laurel Baye Master Lease Obligations.

26.     The Working Capital Obligations and the Master Lease Obligations are substantially cross-collateralized and cross-defaulted.  Additionally, a default under the Sterling Facility or the New Ark Mezz Note (defined below) also constitutes a default under the Master Leases and the Working Capital Loan.

### D.     New Ark Mezz Note.

27.     Pursuant to the First Amended and Restated Subordinated Promissory Note, dated April 1, 2014, 4 West Holdings issued a $11,150,000 subordinated secured note (as amended, the "New Ark Mezz Note") to New Ark Mezz Holdings, LLC ("New Ark Mezz"),[7] the proceeds of which were paid to the Omega Parties as part of the closing of the acquisition by merger (the "Merger") of Ark Holding Company, Inc. d/b/a Covenant Dove ("AHC") pursuant to that certain Agreement and Plan of Merger, dated September 13, 2013, by and among 4 West Holdings, New Ark Investment, Inc. ("NAI"), AHC, and Behrman Capital PEP L.P. (the previous owner of AHC).  The maturity date of the New Ark Mezz Note is March 31, 2018.  As of the Petition Date, the outstanding balance under the New Ark Mezz Note was approximately $6.2 million.

28.     The New Ark Mezz Note is secured by a Subordinated Security Agreement, dated November 27, 2013 whereby New Ark Mezz was granted a second priority security interest in all of 4 West Holdings' ownership interests in New Ark SC Operator Holdings, Inc. (n/k/a Orianna SC Operator Holdings, Inc., a Debtor in these Chapter 11 Cases).[8]  New Ark Mezz's rights are

---

[7]     HCN is a member of New Ark Mezz.

[8]     Certain Omega Parties hold the first priority security interest.

subordinated to the rights of the Sterling Parties under the Sterling Facility[9] and the rights of the Omega Parties under the Master Leases.[10]

### E.    SA Mezz Note.

29.    Pursuant to the Amended and Restated Promissory Note, dated February 1, 2017, Debtor Palladium issued a $1,100,000 unsecured promissory note (the "SA Mezz Note") to SA Mezz Holdings, LLC ("SA Mezz"), the proceeds of which were applied in connection with Palladium's acquisition of Pinnacle Hospice, LLC in August 2016.  The maturity date of the SA Mezz Note is August 1, 2021.  As of the Petition Date, the outstanding balance of the SA Mezz Note, with interest, was approximately $1.2 million.

### F.    Other Debt.

30.    As of the Petition Date, the Debtors owe an aggregate of approximately $67 million in unsecured trade debt, most of which is owed to vendors who provide goods or services necessary in the operation of the SNFs.

## II.    Debtors' Need For Postpetition Financing Cash Collateral.

31.    The Debtors require both the use of Cash Collateral and the financing proposed herein to continue to operate their businesses during these Chapter 11 Cases.  If the Debtors are unable, on a consistent basis, to maintain their businesses and demonstrate financial stability to existing and future residents, the Debtors' Facilities will lose existing residents, employees, and vendors, will be unable to attract new residents and will be forced to cease operations.  Such a result will not only cause harm to the Debtors, but it will also cause harm to the residents of the Facilities if the Debtors are unable to provide proper care as they may be forced to relocate.

---

[9]    Pursuant to the Subordination Agreement (Mezzanine Loan) by and between Sterling National Bank, as agent, and New Ark Mezz Holding, LLC, as Mezzanine Lender, dated March 1, 2016.

[10]    Pursuant to the Subordination Agreement (Mezzanine Loan) by and between the Master Lease Landlords and New Ark Mezz Holding, LLC, as Mezzanine Lender, dated November 27, 2013.

Therefore, post-petition financing and the use of Cash Collateral is essential to the Debtors' continued ability to operate, to maintaining the value of their assets, and to the success of these Chapter 11 Cases.

32. The Debtors have determined that they will not be able to adequately finance their business operations by using only Cash Collateral and therefore they require immediate access to additional financing. To fund this shortfall, the Debtors sought out offers before the Petition Date to provide financing to the Debtors during these Chapter 11 Cases. As any such lender would have required a first-priority priming lien on all of the assets of the Debtors securing all amounts advanced by such lender, the Debtors discussed with and sought such debtor-in-possession financing with their existing secured lenders. In addition, the Debtors' structure, operations and financial condition made financing accommodations from institutional funding sources that are unfamiliar with the Debtors' business operations extremely unlikely.

33. The Debtors attempted to seek consensus among their prepetition lenders for the Debtors' receipt of debtor-in-possession financing and use of cash collateral. However, neither the Sterling Parties nor the Prepetition Secured Parties were willing to consent to the granting of any priming liens on their collateral in favor of the other party. Moreover, the Sterling Parties have taken the position that the Sterling Intercreditor Agreement precludes the granting of priming liens on their collateral absent their consent. Finally, a major portion of the Restructuring Support Agreement involves restructuring the financial arrangements with a group of the Debtors' prepetition secured lenders (the Omega Parties). Therefore, after careful consideration in consultation with their professionals, the Debtors ultimately decided, in their business judgment, that the proposal for debtor in possession financing advanced by the DIP Lender (one of the Omega Parties) was the best alternative. Pursuant to the DIP Credit

Agreement, DIP Lender would advance (i) a Term Loan to repay the Sterling Obligations following entry of the Interim Order, and (ii) Revolving Loans to fund the Debtors' postpetition business operations. This financing eliminates an entire group of the Debtors' prepetition secured lenders (the Sterling Parties) without increasing the Debtors' overall secured indebtedness (an administrative convenience that saves expense), avoids a priming fight with any of the Debtors' prepetition secured lenders, avoids a cash collateral fight with any of the Debtors' prepetition secured lenders, avoids potential intercreditor agreement disputes, and aligns the Debtors' vision with how these cases should proceed with that of the Debtors' remaining prepetition secured lenders. In short, the financing allows the Debtors to have a soft landing into bankruptcy, saves legal and other expenses, creates certainty of outcome, and provides the Debtors with necessary funding for their reasonably foreseeable working capital needs in the near term. None of the initial borrowings under the DIP Facility will be used to refinance or "roll up" any obligations owing to the DIP Lender or any of its affiliates.

34.    The Debtors and their counsel have reviewed the security documents, and the financing statements with respect to the Sterling Facility and such review demonstrates that the Sterling Agent has properly filed UCC-1 financing statements against the Sterling Borrowers in each of the applicable jurisdictions, and holds a first-priority perfected security interest in the Sterling Collateral. A review of the Debtors' books and records reflects that the Sterling Parties are owed approximately $14,216,459.08 as of the Petition Date, and the Sterling Collateral has, based upon the Debtors' current calculations, a value substantially in excess of the Sterling Obligations. The DIP Facility is sufficient to repay the Sterling Obligations in full and provide sufficient new money liquidity for the Debtors' Chapter 11 Cases.

35.     As noted above, the Debtors suffer from constrained liquidity.  The Term Loan charges the same rate of interest that the Sterling Parties are currently charging the Debtors so there will be no increased interest burden on the Debtors by the substitution of DIP Lender for the Sterling Parties on account of such secured indebtedness.  Importantly, however, the DIP Financing substantially improves the Debtors' liquidity by providing an immediate infusion of additional funds that are required in order to permit the Debtors to stabilize their operations and cash flow, which will maximize the potential value of their assets to their estates and creditors.  Absent such an infusion, it is likely that the Debtors will suffer immediate and irreparable harm.  Therefore, the Debtors are seeking interim approval to borrow $25 million of the DIP Financing under the Interim Order (with $5 million blocked until entry of the Final Order) so that they may pay off the Sterling Obligations and meet their working capital needs, including making payments to their employees.  In another recent case in which the debtors requested immediate access to its debtor-in-possession financing to pay off a prepetition secured lender, the Court authorized the debtors to borrow funds to make such payment under the interim order.  *See In re Vertellus Specialties Inc.,* Case No. 16-11290 (CSS) (Bankr. D. Del. June 1, 2016) (permitting debtor to borrow DIP loan on first day in order to pay off prepetition secured loan).

36.     As noted, the Sterling Payoff is necessary to ensure the consent of the Sterling Parties and to avoid an objection to this DIP Financing Motion from the Sterling Parties, which could cause expensive, risky litigation and a potential delay in the Debtors' access to required liquidity.  Any such litigation would be detrimental to the Debtors' efforts to smoothly transition into bankruptcy, maintain vendor and resident confidence and maximize the Debtors' enterprise value.  As noted above, the Debtors believe that the collateral securing the Sterling Obligations

20

exceeds the extent of the Sterling Obligations as of the Petition Date and that the Sterling Agent holds a fully secured claim; therefore, the Debtors, their estates and creditors will not be prejudiced by permitting the Debtors to obtain the DIP Financing and to execute and perform under the Payoff Letter. Moreover, the Interim Order provides for a standard creditor review period for the Sterling Obligations, and the Sterling Agent is a major financial institution with sufficient resources to deal with any successful creditor challenge to the repayment of its secured loan.

37.     Immediate access to postpetition financing and the use of Cash Collateral is necessary to enhance the Debtors' liquidity, provide necessary working capital during the pendency of these Chapter 11 Cases, and provide residents, employees, vendors, suppliers, regulatory agencies and other key constituencies with confidence that the Debtors have sufficient resources available to maintain their operations in the ordinary course.  If the Debtors are unable to access this postpetition financing and use Cash Collateral, the Debtors' business operations and ability to provide proper resident care will be irreparably harmed.  For the foregoing reasons, entry of an order in the form attached hereto as <u>Exhibit D</u> (the "<u>Interim Order</u>") is in the best interests of the Debtors' estates, creditors, residents and other parties in interest.

## **RELIEF REQUESTED**

38.     This DIP Financing Motion requests entry of the Interim Order and a final order (a "<u>Final Order</u>") pursuant to sections 105, 361, 362, 363, and 364 of title 11 of the Bankruptcy Code, and in accordance with Rules 2002, 4001, 6004 and 9014 of the Bankruptcy Rules:

(a)     authorizing Debtors to obtain post-petition financing an aggregate principal amount of $30,000,000 (the "<u>DIP Facility</u>") from the DIP Lender pursuant to the DIP Credit Agreement;

(b)     authorizing and approving the Debtors to (i) execute and deliver the DIP Credit Agreement in substantially the same form attached hereto as

21

Exhibit C and (ii) perform such other acts or amendments as may be requested by the DIP Lender as necessary or desirable, in DIP Lender's sole and absolute discretion but consistent with the Interim Order, in connection with the DIP Credit Agreement and the Interim Order, including, without limitation, the delivery and execution, in connection with a Final Order, of final debtor-in-possession loan documentation acceptable the DIP Lender in its sole and absolute discretion but consistent with the Interim Order and the DIP Credit Agreement;

(c)     authorizing and directing Debtors to perform all of their obligations under the DIP Documents, including to (i) pay the principal, interest, fees, expenses, and other amounts payable under the DIP Credit Agreement as such become due, including, without limitation, reasonable fees incurred and disbursements made by DIP Lender for attorneys, advisors, accountants, and other consultants, and (ii) pay such other expenses set forth in the budget (as approved by DIP Lender pursuant to the DIP Credit Agreement, the "Budget"), in each case in accordance with the Interim Order and the DIP Credit Agreement;

(d)     approving, as applicable, Debtors' grant of mortgages, security interests, liens and superpriority claims to the DIP Lender including:

i.     an allowed administrative-expense priority claim against each Debtor, on a joint and several basis, pursuant to section 364(c)(1) of the Bankruptcy Code *pari passu* to any allowed superpriority administrative expenses claims granted to the Sterling Parties and senior to and with priority over all other administrative expenses and any other claims against the Debtors and their estates, including, without limitation, of the kinds specified in or arising or ordered under Sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c) (subject to and upon entry of the Final Order), 507(a), 507(b), 546(c), 726, 1113 and 1114 of the Bankruptcy Code or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to Section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, subject only to the Carve Out (as defined in the Interim Order);

ii.     pursuant to Section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable, automatically and properly perfected first priority liens on and security interests in all DIP Collateral that is not otherwise subject to the Prepetition Liens or any Permitted Prior Liens;

iii.     pursuant to Section 364(c)(3) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable, automatically and properly perfected junior liens on and security interests in all DIP Collateral that is subject to any Permitted Prior Liens, which junior liens and

security interests in favor of the DIP Lender shall be subject only to any such Permitted Prior Liens; and

    iv. pursuant to Section 364(d)(1) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable, automatically and properly perfected first priority senior priming liens on and security interests in all DIP Collateral securing the Prepetition Obligations, which senior priming liens and security interests in favor of the DIP Lender shall be subject only to any Permitted Prior Liens on such DIP Collateral;

(e) modifying the automatic stay to the extent necessary to implement and effectuate the DIP Documents and the Interim Order;

(f) approving the Debtors' use of Cash Collateral in accordance with the Interim Order;

(g) approving the granting of adequate protection for use of Cash Collateral or for diminution in the value of the Prepetition Secured Parties' Prepetition Collateral (as defined in the Interim Order);

(h) authorizing (i) the repayment in full, in cash, of the Sterling Obligations on the date of the closing of the DIP Facility in accordance with the Payoff Letter, (ii) the provision of adequate protection to the Sterling Parties of their interests in the assets of the Sterling Borrowers that secure the Sterling Secured Claim (as defined in the Interim Order) for repayment of the Sterling Loan Obligations (as defined in the Interim Order), and (iii) payment of the Remaining Sterling Obligations (as defined in the Interim Order); and

(i) scheduling a final hearing (the "<u>Final Hearing</u>") to consider entry of a Final Order granting the relief requested in this DIP Financing Motion on a final basis for a date that is on or before the 30th day after the Petition Date.

**A.    Compliance with Requirements of Bankruptcy Rule 4001.**

39.    In accordance with Bankruptcy Rule 4001(c)(1)(B), the following is a concise

statement of the material provisions of the DIP Credit Agreement and the Interim Order:

| Provision | Summary | Location |
|---|---|---|
| DIP Agreement Parties | Borrowers: 4 West Holdings, Inc., a Delaware corporation (the "<u>Parent Borrower</u>"), each of the direct and indirect subsidiaries of the Parent Borrower party to the DIP Credit Agreement as a "Borrower" (each individually, a "<u>Subsidiary Borrower</u>" and collectively, the "<u>Subsidiary Borrowers</u>"; and together with the Parent Borrower, the "<u>Borrowers</u>"), <br><br> Guarantors: each of the direct and indirect subsidiaries of the Parent Borrower party to the DIP Credit Agreement as a "Guarantor" (each individually, a "<u>Guarantor</u>" and collectively, the "<u>Guarantors</u>") <br><br> Lender: OHI Asset RO, LLC, a Maryland corporation | DIP Credit Agreement at 1 and signature pages |

| Provision | Summary | Location |
|---|---|---|
| Interest Rate | Interest Rate:<br>Revolving Loans: LIBOR <u>plus</u> nine percent (9.0%) per annum,<br>Term Loan:  LIBOR <u>plus</u> five and one-half percent (5.5%) per annum<br><br>Default Rate:   the Interest Rate <u>plus</u> two hundred (200) basis points.<br><br>"<u>LIBOR</u>" means the interest rate which is the one (1) month London Interbank Offered Rate as published in the "Money Rates" section of *The Wall Street Journal* as the reported rate for the date that is two (2) London banking days prior to the applicable Interest Rate Change Date; *provided, however,* if LIBOR shall be less than one percent (1%), it shall be deemed to be one percent (1%) for the purposes of this Agreement.<br><br>Interest is computed on the basis of a 360-day year and the actual number of days elapsed in the period during which it accrues. | DIP Credit Agreement at definitions of "Interest Rate", "Applicable Margin", "Default Rate", "LIBOR", and Sections 3.1(c) and 3.3(c) |
| Maturity/ Termination | The earliest to occur of (i) the September 30, 2018 ("<u>Maturity Date</u>"), (ii) the date of the substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of a plan of reorganization confirmed in the Chapter 11 Cases, and (iii) the acceleration of the Loans and termination of the Commitments.<br><br>Mandatory Prepayments:<br>(a)        If at any time the Revolving Loan Availability is less than zero, the Loan Parties shall immediately prepay the Revolving Loans in an amount necessary to eliminate such deficiency.<br>(b)        No later than the first Business Day following the date of receipt by any Loan Party of any proceeds not customarily received in the Ordinary Course, including, without limitation, (i) proceeds under any business interruption or casualty insurance policy in respect of a covered loss thereunder, (ii) proceeds received as a result of the taking of any assets of any Loan Party pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking (in each case net of any actual and reasonable documented costs incurred by the Loan Parties in connection with the adjustment or settlement of any such claims), or (iii) deposit refunds, pension plan reversions, indemnity payments, or any purchase price adjustments related to a sale or disposition of any assets, such Loan Party shall prepay the Obligations in an amount equal to 100% of such proceeds in accordance with Section 8 of the DIP Credit Agreement..<br>(c)        Except as provided otherwise in a plan of reorganization confirmed in the Chapter 11 Cases, upon the sale or disposition of the assets of any Loan Party (other than any sale or disposition in the Ordinary Course of such Loan Party), such Loan Party shall prepay the Obligations in an amount equal to 100% of the proceeds of such sale or disposition (net of any actual and reasonable documented costs incurred by the Loan Parties in connection with such sale or disposition) in accordance with Section 8 of the DIP Credit Agreement. | DIP Credit Agreement at definitions of "Maturity Date", "Termination Date", and Sections 3.1(a), 3.3(a), and 3.4 |
| Events of Default | An Event of Default shall be deemed to continue until duly waived in writing by the Lender.  The Events of Default are as follows:<br>(a)        Failure to pay principal on the due date or interest within three (3) Business Days after the due date;<br>(b)        Failure to pay when due any Lender Expenses or other amounts within fifteen (15) days after the same shall first come due and payable;<br>(c)        A Loan Party fails to observe or perform (i) any term, covenants or condition under **Sections 6.2** through **6.4**, **6.6** through **6.10**, or **6.12** through | DIP Credit Agreement at Section 9.1 |

24

| Provision | Summary | Location |
|---|---|---|
|  | **6.15**, or **Section 7** of the DIP Credit Agreement or (ii) any other term, covenant or condition of the DIP Credit Agreement or any other Loan Document (other than those which constitute a default under another provision of Section 9.1 of the DIP Credit Agreement) within a period of fifteen (15) days after the earlier of (x) a Loan Party's knowledge of such failure, or (y) Notice thereof from Lender;<br>(d)  An Event of Default under any other Loan Document;<br>(e)  The material inaccuracy in any statement, assurance, representation, covenant, warranty, term or condition by a Loan Party contained in this Agreement, which inaccuracy could reasonably be expected to have a Material Adverse Effect;<br>(f)  Any of the Chapter 11 Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;<br>(g)  Any Loan Party shall file, support or fail to oppose: (i) a motion or other pleading seeking the dismissal of any of the Chapter 11 Cases; (ii) a motion or other pleading seeking a change of venue with respect to any of the Chapter 11 Cases; (iii) a motion for approval of any superpriority claim (other than the Carve-Out) in any of the Chapter 11 Cases which is pari passu with or senior to the claims of the Lender against any Loan Party hereunder, or there shall arise or be granted any such pari passu or senior superpriority claim without the consent of the Lender in its sole discretion; (iv) any challenge (whether by commencement of a contested matter, adversary proceeding, or otherwise) of (x) any of the admissions, acknowledgments, agreements, or stipulations related to the Lender or any of the Prepetition Secured Parties, and (y) any transaction, occurrence, omissions, action, or other matter related to the Lender or any of the Prepetition Secured Parties, including via any Secured Party Claim (as defined in the Orders); (v) any motion seeking entry of an order authorizing or approving the sale or assignment of any of its assets or procedures in respect thereof without first obtaining the consent of the Lender; or (vi) a motion seeking authority for any Loan Party to obtain alternative financing or to use Collateral without the prior consent of the Lender;<br>(h)  A trustee under Chapter 7 shall be appointed in any of the Chapter 11 Cases;<br>(i)  The Bankruptcy Court shall enter an order (i) terminating or modifying the Loan Parties' use of Cash Collateral without the consent of the Lender; or (ii) (x) charging any of the Collateral under Sections 105(a) or 506(c) of the Bankruptcy Code, or (y) limiting the extension under Section 552(b) of the Bankruptcy Code of the Prepetition Liens to any proceeds, products, offspring or profits of the Prepetition Collateral acquired by any Loan Party after the Petition Date;<br>(j)  The Loan Parties shall fail to comply with the terms of the Orders or any other order of the Bankruptcy Court;<br>(k)  (i) The Interim Order shall not have been entered by the Bankruptcy Court within three (3) Business Days after the Petition Date; (ii)  the Closing Date shall not have occurred within two (2) Business Days after entry of the Interim Order in the Chapter 11 Cases; (iii) the Final Order shall not have been entered by the Bankruptcy Court within 30 (thirty) days after the Petition Date or does not include (x) waivers of the provisions of Sections 506(c) of the Bankruptcy Code, the "equities of the case" exceptions or claims under Section 552(b) of the Bankruptcy Code, and the equitable doctrine of marshalling, and (y) a grant of Liens on the proceeds of the Avoidance Actions; or (iv) the Orders shall cease to create a valid and perfected Lien on the Collateral, cease to be in full force and effect, or shall be amended, supplemented, stayed, reversed, vacated or otherwise modified without the written consent of the Lender; |  |

| Provision | Summary | Location |
|---|---|---|
| | (l)       The Loan Parties fail to achieve any of the Milestones in accordance with the timeframes set forth on Schedule 6.14.<br>(m)      The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure or enforcement of any kind (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Loan Parties which have a value in excess of $100,000 in the aggregate;<br>(n)       (i) Any judgment or order as to a post-petition liability or debt for the payment money in excess of $200,000 shall be rendered against any of the Loan Parties and such judgment shall remain undischarged and there shall be any period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or (ii) any non-monetary judgment or order with respect to a post-petition event shall be rendered against any Loan Party which does not has nor could reasonably be expected to have, a Material Adverse Effect<br>(o)       The garnishment, attachment, levy or other similar action taken by or on behalf of any creditor of a Loan Party, any Affiliate, or any of their respective properties which could reasonably be expected to have a Material Adverse Effect;<br>(p)       The Loan Parties shall fail to pay the Sterling Obligations in full within three (3) Business Days after entry of the Interim Order;<br>(q)       The termination of Loan Parties' exclusive right granted under the Bankruptcy Code to file a plan of reorganization for the Loan Parties;<br>(r)        (i) Any party to the Restructuring Support Agreement (other than the Lender or its Affiliates) fails to observe or perform any agreement or condition in the Restructuring Support Agreement, or (ii) the Restructuring Support Agreement is terminated for any reason;<br>(s)       The Bankruptcy Court determines that one or more Liens that secure Indebtedness in an aggregate amount in excess of $100,000 and that are not identified on <u>Schedule 1</u> to the DIP Credit Agreement constitute "Permitted Prior Liens" (as defined in the Orders);<br>(t) Lender does not approve any update of an Approved Budget delivered to Lender in accordance with **Section 6.13** within three (3) business days after receipt by the Lender of such update; or<br>(u)       Any occurrence that could reasonably be expected to have a Material Adverse Effect. | |
| Automatic Perfection | Immediately upon and effective as of entry of the Interim Order, the DIP Lender is granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens on (collectively, the "<u>DIP Liens</u>") all DIP Collateral (as defined herein) as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration, or otherwise) of the DIP Obligations. | Interim Order at para. 12(a) |
| Carve-Out | The term "<u>Carve-Out</u>" shall mean, to the extent that sufficient unencumbered funds are not available on the date of the delivery of a Carve-Out Trigger Notice (as defined below) to pay administrative expenses in full, proceeds of the DIP Collateral to pay the following:<br>(i)       all fees required to be paid to the Clerk of this Court and to the Office of the United States Trustee under Section 1930(a) of Title 28 of the United States Code plus interest at the statutory rate;<br>(ii)      unpaid fees and expenses (the "<u>Professional Fees</u>") incurred by professionals or professional firms retained by the Debtors pursuant to Section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the | Interim Order at para. 16(a) |

| Provision | Summary | Location |
|---|---|---|
| | "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") before or on the Carve-Out Trigger Notice Date (as defined below), but only to the extent that payment of such Professional Fees (A) does not violate any of the limitations or restrictions set forth in Section 6.12 of the DIP Credit Agreement or associated with the Maximum Investigation Budget, and (B) is otherwise in accordance with the Approved Budget and subsequently allowed on a final basis by this Court; and<br>(iii) Professional Fees incurred by the Debtor Professionals on or after the day following the Carve-Out Trigger Notice Date in an aggregate amount not to exceed $250,000 (exclusive of retainers), and (B) Professional Fees incurred by the Committee Professionals on or after the day following the Carve-Out Trigger Notice Date in an aggregate amount not to exceed $50,000, but in each case only to the extent that payment of such fees and expenses is subsequently allowed on a final basis by this Court (the amounts set forth in this clause (iii) being the "Carve-Out Trigger Notice Cap").<br>For purposes of the foregoing, (x) "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee (if appointed), which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Carve-Out Trigger Notice Cap has been invoked, and (y) "Carve-Out Trigger Notice Date" shall mean the day on which the Carve-Out Trigger Notice is delivered by the DIP Lender to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee (if appointed). | |
| Borrowing limits | Revolving Loans:<br><br>Revolving Loan Maximum: $15,783,540.92<br>Minimum Draw: $10,000, and each draw shall be in minimum increments of $10,000.<br><br>Term Loan:<br>Loan Amount: Up to $14,216,459.08 | DIP Credit Agreement Sections 3.3(a), and 3.4(a); "Revolving Loan Commitment" definition; "Term Loan Commitment" definition |

## B. Compliance with Requirements of Bankruptcy Rule 4001(c)(B)(i)-(xi).

| Provision | Summary | Location | In effect if interim approval is granted, but final relief is denied? |
|---|---|---|---|
| | | | |

27

| Provision | Summary | Location | In effect if interim approval is granted, but final relief is denied? |
|---|---|---|---|
| A grant of priority or a lien on property of the estates under § 364(c) or (d) | (1) Superpriority administrative claim under § 364(c)(1);<br>(2) First priority liens on unsecured DIP Collateral under § 364(c)(2);<br>(3) Junior liens on all DIP Collateral that is subject to any Permitted Prior Liens under § 364(c)(3);<br>(4) Senior priming liens on all DIP Collateral securing the Prepetition Obligations under § 364(d)(1); | Interim Order at paras. 11, 13 | Yes |
| The providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estates to secure the claim, or the use of property of the estates or credit obtained under § 364 to make cash payments on account of the claim | The Prepetition Secured Parties will receive payment of one-half (½) accrued postpetition interest at the default rate set forth in the Working Capital Documents, payment of Interim Rent (as defined in the RSA), reimbursement of pre and postpetition fees, costs, and expenses due under the Prepetition Documents, replacements liens, and superpriority administrative expense claims as adequate protection for the use of their cash collateral and the diminution in the value of their prepetition secured collateral.<br><br>Sterling Parties will receive replacement liens and superpriority administrative expense claims as adequate protection of their interest in the assets of the Sterling Borrowers that secure the Sterling Secured Claim for repayment of the Sterling Loan Obligations. | Interim Order at para. 14 | Yes |
| A determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim | Parties in interest with standing in the Cases (other than the Debtors) may challenge any of the Debtors' Stipulations by the earliest of the following: (A) 60 days from the date of appointment of the Committee, or, if no Committee is appointed, 75 days following the entry of the Interim Order, and (B) the date of the entry of the 9019 Settlement Order (as defined in the RSA). | Interim Order at para 18 | Yes |
| A waiver or modification of Code provisions or applicable rules relating to the automatic stay | As needed to perfect liens granted pursuant to the Interim Order and the DIP Documents. | Interim Order at para 19 | Yes |

28

| Provision | Summary | Location | In effect if interim approval is granted, but final relief is denied? |
|---|---|---|---|
| A waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request authority to obtain credit under § 364 | n/a | | Yes |
| The establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order | Entry of a Confirmation Order by 110 days after the Petition Date | Restructuring Support Agreement at 4(b)(iv) | Yes |
| A waiver or modification of the applicability of non-bankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien; | The DIP Liens automatically perfected | Interim Order at para. 13(a) | Yes |
| A release, waiver, or limitation on any claim or other cause of action belonging to the estates or the trustee, including any modification of the statute of limitations or other deadline to commence an action | The Debtors waive all claims with respect to the Debtor's Stipulations in the Interim Order; the Interim Order establishes deadlines for any challenge of the Debtors' Stipulations by parties in interest with standing. | Interim Order at paras. 18-19 | Yes |

| Provision | Summary | Location | In effect if interim approval is granted, but final relief is denied? |
|---|---|---|---|
| The indemnification of any entity | Each Loan Party shall indemnify, defend and hold harmless the Lender, and its respective officers, employees and agents, of and from any claims, demands, liabilities, obligations, judgments, injuries, losses, actual damages and reasonable and documented out-of-pocket costs and expenses (including, without limitation, reasonable and documented out-of-pocket legal fees of one outside counsel) resulting from (i) acts or conduct of any Loan Party under, pursuant or related to the DIP Credit Agreement and the other Loan Documents (as defined therein), (ii) any Loan Party's breach or violation of any representation, warranty, covenant or undertaking contained in DIP Credit Agreement or the other Loan Documents, and (iii) any Loan Party's failure to comply with any or all laws, statutes, ordinances, governmental rules, regulations or standards, whether federal, state or local, or court or administrative orders or decrees, (including without limitation environmental laws, *etc*.) and all costs, expenses, fines, penalties or other actual damages resulting therefrom, unless resulting from acts or conduct of the Lender or its Affiliates, constituting willful misconduct or gross negligence. | Interim Order at para. 10; DIP Credit Agreement at 11.9. | Yes |
| A release, waiver, or limitation of any right under §506(c) | Subject to and upon entry of the Final Order, (a) the Debtors shall irrevocably waive and be prohibited from asserting any surcharge claim, whether under Sections 105(a) or 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender or the Prepetition Secured Parties upon, the DIP Collateral or the Prepetition Collateral, and (b) no costs or expenses of administration that have been or may be incurred in any of the Chapter 11 Cases or any Successor Cases at any time shall be charged against the DIP Lender, the Prepetition Secured Parties, any of their respective claims or liens (including any claims or liens granted pursuant to this Interim Order), the DIP Collateral, or the Prepetition Collateral pursuant to Sections 105(a) or 506(c) of the Bankruptcy Code or otherwise. | Interim Order at para. 19 | No |

| Provision | Summary | Location | In effect if interim approval is granted, but final relief is denied? |
|---|---|---|---|
| The granting of a lien on any claim or cause of action arising under §§ 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a). | Subject to and upon entry of the Final Order, the DIP Collateral shall include the proceeds of avoidance actions | Interim Order at para. 12(a) | No. |

## BASIS FOR RELIEF REQUESTED

### A.    Cash Collateral and Adequate Protection.

40.    Section 363(c) of the Bankruptcy Code provides that a debtor-in-possession may use cash collateral if all interested entities consent or the court, after notice and a hearing, authorizes such use. 11 U.S.C. § 363(c). Section 363(e) of the Bankruptcy Code requires that the use of cash collateral be prohibited or conditioned as is necessary to provide adequate protection to persons that have an interest in cash collateral. *In re DeSardi*, 340 B.R. 790, 797 (Bankr. S.D. Tex. 2006) ("Adequate protection is . . . grounded in the belief that secured creditors should not be deprived of the benefit of their bargain").  Read together, § 363(c) and (e) of the Bankruptcy Code authorize a debtor-in-possession to use the cash collateral of a secured creditor if such creditor's collateral is adequately protected. *See In re Harrington & Richardson, Inc.*, 48 B.R. 431, 433 (Bankr. D. Mass. 1985) (finding that the court may authorize the use of cash collateral upon a showing that those with an interest in the cash collateral are adequately protected).

41.    Although the term "adequate protection" is not precisely defined in the Bankruptcy Code, § 361 sets forth three non-exclusive examples of what may constitute adequate protection: (1) periodic cash payments equivalent to the decrease in value of the

31

creditor's interest in the property; (2) an additional or replacement lien on other unencumbered property of the debtor; or (3) other relief that provides the indubitable equivalent of the creditor's property interest. *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 793 F.2d 1380, 1388 (5th Cir. 1986). "[T]he debtor-in-possession has the burden of proof on the issue of adequate protection." *In re Cafeteria Operators, L.P.*, 299 B.R. 400, 406 (Bankr. N.D. Tex. 2003).

42.     Bankruptcy Rule 4001(b) permits a court to approve use of cash collateral during the fifteen-day period following the filing of a motion only to the "extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Here, the Debtors require immediate access to the Cash Collateral to, among other things, fund any interim obligations while final approval of the DIP Credit Agreement is pending.

43.     Accordingly, the Debtors request that the Court authorize the Debtors to immediately borrow and use the Cash Collateral for payment of the amounts set forth in the Budget, pending a Final Hearing.  At the Final Hearing, the Debtors request that the relief requested herein be granted on a permanent basis.

**B.     The Debtors Should Be Authorized to Obtain Post-Petition Financing.**

44.     Section 364 of the Bankruptcy Code provides the requirements for a debtor to obtain post-petition financing, stating:

(a)     If the trustee is authorized to operate the business of the debtor under section 721, 1108, 1203, 1204, or 1304 of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.

(b)     The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense.

    (c)     If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt— (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; (2) secured by a lien on property of the estates that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estates that is subject to a lien.

    (d)     The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estates that is subject to a lien only if (A) the trustee is unable to obtain such credit otherwise; and (B) there is adequate protection of the interest of the holder of the lien on the property of the estates on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(a)–(d).

45.    The sub-sections of § 364 work together in alternative form. If a debtor is unable to obtain unsecured credit in the ordinary course of business under sub-section 364(a), the debtor may seek authority to obtain credit outside the ordinary course of business under subsection 364(b). *Id.* § 364(a)–(b). If that authority is insufficient, the debtor may seek authority to obtain credit with specialized priority or with security. *Id.* § 364(c)(1)–(3). If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, the Court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to super-priority administrative expense status or is secured by a lien on unencumbered property, or a combination of the foregoing. *Id.* § 364(d).

46.    The statutory requirement for obtaining post-petition credit under Section 364 is a finding, made after notice and hearing, that Debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." *In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992) (the debtor must show "by a good faith effort that credit was not available without" the protections of § 364(c)). Section 364 financing is appropriate when the trustee or debtor-in-possession is unable to obtain unsecured credit

allowable as an ordinary administrative claim. *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549, *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (secured credit under § 364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

47.    Courts have articulated a three-part test to determine whether a debtor is entitled to § 364(c) financing: (i) the debtor is unable to obtain unsecured credit under § 364(b) (*i.e.*, by allowing a lender only an administrative claim); (ii) the credit transaction is necessary to preserve the assets of the estate; and (iii) the terms of the transaction are fair, reasonable, and adequate given the circumstances of the debtor and the proposed lender. *See Crouse Grp.*, 71 B.R. at 549. Additionally, courts will generally accord significant weight to the necessity of the debtor obtaining post-petition financing in order to remain viable. *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

48.    The Debtors' immediate access to liquidity is essential to the Debtors' operations and the value of their assets. Absent access to the working capital financing that will be available to the Debtors under the proposed DIP Credit Agreement on an interim basis, the Debtors will be unable to maintain their business operations or preserve the value of their assets. The Debtors believe that the terms and conditions of the DIP Credit Agreement, the proposed Interim Order, and the related relief requested herein are fair, reasonable, and in the best interests of the Debtors, their estate, and their creditors.

49.    As discussed in further detail below, the Debtors propose to obtain financing under the DIP Credit Agreement, the Interim Order, and the Final Order by providing security interests in and liens on the DIP Collateral pursuant to Bankruptcy Code § 364. The evidence presented at the interim and final hearings will show that financing of the type needed in these

34

Chapter 11 Cases could not have been obtained under ordinary-course-of-business terms or on an unsecured basis as an administrative expense pursuant to § 364(b) or (c). Therefore, Debtors seek authorization to obtain credit or to incur debt (i) with priority over administrative expenses of the kind specified 11 U.S.C. §§ 503(b) or 507(b) pursuant to § 364(c)(1), (ii) secured by a lien on property of the Debtors' estates that is not otherwise subject to a lien pursuant to § 364(c)(2), and (iii) secured by a "priming" liens on property of the Debtors' estates that are subject to the liens of the Prepetition Secured Parties pursuant to § 364(d)(1).  Additionally, with the consent of the Prepetition Secured Parties, Debtors seek authorization to obtain credit or to incur debt secured by a senior, priming lien on property of the estates that is subject to the liens of the Prepetition Secured Parties pursuant to § 364(d)(1).  The Debtors contend that there is adequate protection of the interest of the holders of the liens on the property of the estates on which such "priming" liens are proposed to be granted (and such parties have, in fact, consent to such "priming" liens).

### i.    Debtors Do Not Have an Alternative to the DIP Credit Agreement.

50.    The evidence at the interim hearing will show that debtor-in-possession financing of the type needed in this case could not have been obtained on an unsecured basis.  Indeed, the potential sources of a debtor-in-possession facility for the Debtors, obtainable on an expedited basis and on reasonable terms, are practically nonexistent.  In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *In re Snowshoe Co.*, 789 F.2d at 1088.  A debtor needs only demonstrate "by a good faith effort that credit was not available without" the protections of § 364(c).  *Id.; In re Plabell*, 137 B.R. at 900. Where there are few lenders likely to be able and/or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr.

N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Sav. Bank FSB v. Sky Valley*, 99 B.R. 117, 120 n.4 (N.D.

Ga. 1989). Thus, the Debtors have satisfied the requirement of § 364(c) that unsecured credit was

unavailable.

51.     Because of the Debtors' acute liquidity crisis, the status of the Debtors' operations

and collateral base, the need to maintain key employees, and the impracticability and cost of

pursuing commitments from numerous prospective lenders, it was not practicable to try to

"shop" the DIP Credit Agreement to all possible lenders prior to the Petition Date.  The DIP

Lender is an affiliate of a group of prepetition secured lenders to and landlord of the Debtors.  As

a result, the DIP Lender is familiar with the Debtors' business operations, corporate structure,

financing arrangements, and collateral base, and has already performed due diligence in

connection with the DIP Credit Agreement, was able to offer DIP financing to meet the Debtors'

working capital needs on the terms and within the time frame needed by the Debtors.

> ### ii.     The DIP Financing is Necessary to Preserve the Assets of the Debtors' Estates.

52.     The Court should authorize the Debtors to enter into the DIP Credit Agreement

and obtain the financing described in the DIP Credit Agreement as an exercise of the Debtors'

sound business judgment. Provided that an agreement to obtain secured credit does not run afoul

of the provisions of, and policies underlying, the Bankruptcy Code, courts grant debtors

considerable deference in acting in accordance with their sound business judgment in obtaining

such credit. *See In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr.

S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long

as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of

the reorganization to one party in interest"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40

(Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section

36

364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estates as it is to benefit a party-in interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) ("[T]the applicable factors can be synthesized . . . [t]hat the proposed financing is an exercise of sound and reasonable business judgment . . . .").

53.     The Debtors exercised their best business judgment in negotiating the DIP Credit Agreement and the Interim Order that is presently before the Court. Debtors negotiated the DIP Credit Agreement with the DIP Lender in good faith, at arm's-length, and with the assistance of outside counsel, to obtain the required post-petition financing on terms as favorable as possible for the Debtor under the circumstances.

54.     The Debtors and their advisors determined in their business judgment that the DIP Credit Agreement provides a greater amount of financing on more favorable terms than any other reasonably available alternative.  As noted above, the DIP Credit Agreement will provide the Debtors with much-required access to necessary liquidity, which the Debtors and their advisors have independently determined should be sufficient to support Debtors' ongoing operations and reorganization activities through the pendency of the Chapter 11 Cases. Thus, the Debtors submit that entering into the DIP Credit Agreement constitutes an exercise of the Debtors' sound business judgment that should be approved by the Court.

### iii. The Terms of the DIP Credit Agreement Are Reasonable.

55.     The terms of the proposed DIP Credit Agreement represent the most favorable terms to the Debtors on which the DIP Lender would agree to make the DIP Credit Agreement available.  The Debtors considered the terms described herein when determining in their sound

business judgment that the DIP Credit Agreement constituted the best terms on which Debtors could obtain the post-petition financing necessary to continue their operations and prosecute the Chapter 11 Cases. The availability of the DIP Facility is in the best interests of Debtors' estate, creditors, and other parties in interest.

### C. Modification of the Automatic Stay Is Warranted.

56. The relief requested herein contemplates a modification of the automatic stay pursuant to Bankruptcy Code section 362 to the extent necessary to permit the DIP Lender to exercise, upon the occurrence and during the continuation of any Termination Event, all rights and remedies provided for in the Interim Order and the Final Order, after five (5) days' notice thereof, and to take various actions without further order of or application to the Court. Additionally, the relief requested herein contemplates a modification of the automatic stay insofar as necessary to effectuate all of the terms, rights, benefits, privileges, remedies and provisions of the Interim Order and the DIP Documents (without further notice, motion, application to, order of, or hearing before this Court). The Debtors submit that stay modification provisions of this sort are ordinary and usual features of post-petition debtor-in-possession financing facilities; in the Debtors' business judgment, are reasonable under the present circumstances; and are permissible pursuant to Appendix H of the Local Bankruptcy Rules. Accordingly, the Debtors request that the Court modify the automatic stay to the extent contemplated by the Interim Order and the Final Order.

### D. The DIP Lender Should Be Deemed a Good Faith Lender Under § 364(e).

57. Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

38

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Specifically, § 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

58.     The proposed financing offered by the DIP Lender is the result of arms'-length, good faith negotiations between the Debtors and the DIP Lender. The terms and conditions of the DIP Credit Agreement are fair and reasonable, and the proceeds under the DIP Credit Agreement will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Credit Agreement other than as described herein. Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of § 364(e) and is entitled to all of the protections afforded by that section.

**E.      Interim Approval of the DIP Credit Agreement Is Appropriate.**

59.     Bankruptcy Rule 4001(c)(2) provides that a final hearing on a motion to obtain credit pursuant to 11 U.S.C. § 364 may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

60.     Pursuant to Bankruptcy Rules 4001(c) and (d), the Debtors request that the Court conduct an expedited interim hearing on the date hereof or as soon as practicable to consider entry of the Interim Order authorizing the Debtors to borrow an amount sufficient to fund their operating expenses pending the Final Hearing on the DIP Financing. The Court may grant

39

interim relief in respect of a motion filed pursuant to § 364 where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estates pending a final hearing." FED. R. BANKR. P. 4001(B)(2), (C)(2).

61.     The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein is not granted promptly. Indeed, as explained in the First Day Declaration, unless the Court approves the Debtors' interim access to the DIP Financing, the Debtors will not have access to any cash whatsoever.  Accordingly, Debtors have an immediate need for access to liquidity to, among other things, permit the orderly continuation of the operation of their business, to make payroll, and to satisfy other working capital and operational needs, all of which are required to preserve and maintain Debtors' going concern value for the benefit of all parties in interest.

62.     Accordingly, for all of the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

## REQUEST FOR FINAL HEARING

63.     Pursuant to Bankruptcy Rule 4001(c)(2), Debtors request the Court to set a date for the Final Hearing.

## WAIVER NOTICE AND STAY OF AN ORDER

64.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h), or otherwise.

EAST\150669549.14

## NOTICE

65.     Notice of this DIP Financing Motion shall be provided to: (a) the U.S. Trustee; (b) the Office of the Attorney General of the states in which the Debtors operate Facilities; (c) the Debtors' forty (40) largest unsecured creditors on a consolidated basis; (d) King & Spalding LLP, as counsel for the Sterling Parties; (e) Bryan Cave LLP, as counsel for the DIP Lender and the Prepetition Secured Parties; (f) Neligan LLP, as counsel to the Plan Sponsor, (g) the Internal Revenue Service; (h) the Department of Medicaid, Department of Health, and Division of Health Services Regulation in each state in which the Debtors operate the Facilities; and (i) all other parties with liens of record on assets of the Debtors (as disclosed in lien searches completed by the Debtors prior to the Petition Date).  The Debtors respectfully submit that such notice is sufficient and that no further notice of this DIP Financing Motion is required.

## NO PRIOR REQUEST

66.     No previous request for the relief sought herein has been made to this or any other court.

*[remainder of page left intentionally blank]*

41

WHEREFORE, based upon the foregoing, the Debtors respectfully request that the Court enter an order substantially in the form annexed hereto as <u>Exhibit D</u> (a) granting the relief requested herein and (b) granting such other relief, at law or in equity, as may be deemed just and proper.

Dated: March 6, 2018
Dallas, Texas

Respectfully submitted,

**DLA PIPER LLP (US)**

*/s/ Andrew Zollinger*
Andrew Zollinger, State Bar No. 24063944
DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201-4629
Telephone: (214) 743-4500
Facsimile: (214) 743-4545
Email: andrew.zollinger@dlapiper.com

-and-

Thomas R. Califano (*pro hac vice admission pending*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4500
Facsimile:  (212) 335-4501
Email:  thomas.califano@dlapiper.com

-and-

Daniel M. Simon (*pro hac vice admission pending*)
One Atlantic Center
1201 West Peachtree Street, Suite 2800
Atlanta, Georgia 30309
Telephone: (404) 736-7800
Facsimile:  (404) 682-7800
Email:  daniel.simon@dlapiper.com

EAST\150669549.14