Louis R. Strubeck, Jr.
Ryan E. Manns
**Norton Rose Fulbright US LLP**
2200 Ross Avenue
Suite 3600
Dallas, TX 75201-7932
Email: louis.strubeck@nortonrosefulbright.com
       ryan.manns@nortonrosefulbright.com

Francis J. Lawall (admitted *pro hac vice*)
Donald J. Detweiler (admitted *pro hac vice*)
Joanna J. Cline (admitted *pro hac vice*)
**Pepper Hamilton LLP**
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE 19899-1709
E-mail: lawallf@pepperlaw.com
         detweild@pepperlaw.com
         clinej@pepperlaw.com

*Counsel to the Official Committee of
Unsecured Creditors*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| 4 WEST HOLDINGS, INC., *et al.*, | ) | Case No. 18-30777-(HDH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
## MOTION FOR STANDING TO PURSUE DERIVATIVE CLAIMS
## AGAINST THE OMEGA PARTIES ON BEHALF OF THE DEBTORS' ESTATES

The Official Committee of Unsecured Creditors (the "Committee")[1] of 4 West

Holdings, Inc., *et al.* (the "Debtors"), by and through their undersigned counsel, hereby files this

motion (the "Motion") for entry of an order authorizing the Committee to commence, prosecute,

and settle claims against certain third parties (described below, and in the Draft Complaint) on

behalf and for the benefit of the Debtors' estate.  In support of the Motion, the Committee

respectfully submits as follows:

---

[1] All capitalized terms used herein but not defined have the meaning set forth in the draft
complaint attached as Exhibit B (the "Draft Complaint").

## PRELIMINARY STATEMENT

1.        The Committee has undertaken an investigation of potential claims and causes of action that may be held by the Debtors and their estates against several third parties, including but not limited to the group of entities referred to as the Omega Parties.

2.        The Committee's review is not yet complete, in part because Debtors and the Omega Parties have not produced any email communications that pre-date March 6, 2017. Nevertheless, based on the investigation the Committee has conducted to date, which included the review of thousands of pages of documents, emails, and financial information produced by the Debtors and the Omega Parties, as well as limited depositions, the Committee believes that significant, meritorious claims against the Omega Parties exist, both in terms of affirmative claims as well as defenses to Omega's yet-to-be-filed proof of claim.  These claims include, but are not limited to, the claims set forth in the Draft Complaint.

3.        Moreover, the Committee is presently investigating other claims against the Omega Parties, as well as claims against other persons and entities.  For example, the Committee is investigating claims for recharacterization and subordination regarding the Omega Parties' loans to the Debtors, including the Omega Working Capital Loan.  Also, the Committee is investigating claims against certain officers, directors, and other insiders of the Debtors, including claims for breach of fiduciary duty, and it is correlatively investigating whether the Omega Parties aided and abetted those breaches of fiduciary duty.  In addition, the Committee is investigating claims against third parties, such as the former stockholders of Ark Holding Co., Inc., for the avoidance and recovery of fraudulent transfers made in connection with the leveraged buyout (the "LBO") described in the Draft Complaint.

4.        Because the Debtors have already stipulated to the validity and priority of the Omega Parties' liens, have agreed that no portion of Debtors' pre-petition obligations to the

Omega Parties is subjected to defense or set-off, and have committed to agree to release Omega and others from future claims, the Debtors are not able to assert the claims and defenses contemplated by the Committee. *See* Final DIP Order at ¶ D(xxvi) (D.I. 376); *see also* Proposed Plan. at Art. X.B. (D.I. 438).    In addition, the terms of the Settlement Agreement, which the Court already has approved, bind the Omega Parties to the RSA, which in turn binds the Omega Parties and the Debtors to support the Proposed Plan and the Omega claim and releases, respectively, which in turn provides releases for the insiders and the Omega Parties. *See* Settlement Agreement annexed to Settlement Order, ¶ 3(a) (Ex. 1 to D.I. 375); RSA, ¶¶ 2(d)-(g), 3(a) (D.I. 19-2); Proposed Plan at Arts. I.B. and X.B. (D.I. 438).    Thus, by operation of this series of interconnected agreements, the Debtors are precluded from bringing the claims as to which the Committee is seeking standing.

5.    Because the individuals controlling the Debtors are conflicted, as well as judicially estopped and contractually precluded from prosecuting the proposed adversary proceeding, these valuable claims will not be prosecuted if the Motion is denied. The Committee disputes the nature, extent, validity and priority of Omega's alleged claims and seeks valuable affirmative relief as well.    Accordingly, it is vitally important that the Committee be granted standing to prosecute the Omega Actions on behalf of the Debtors' estates.

6.    Therefore, by this Motion, the Committee seeks standing to bring all claims that it uncovers in the course of its ongoing investigation against the Omega Parties, including, but not limited to the claims alleged in the Draft Complaint, potential claims for aiding and abetting breach of fiduciary duty, and potential claims for recharacterization and subordination regarding the Omega Parties' loans to the Debtors. The Committee also seeks standing to pursue causes of action against entities that are not Omega Parties, but which causes

#48729463 v4

of action are related to claims against the Omega Parties or are reasonably necessary for the estates to pursue in order to obtain certain relief against the Omega Parties.

7.     The Committee also seeks entry of an order authorizing it to object to the Omega Parties' proof of claim.  The claims described in paragraph 6 of this Motion, together with the anticipated Objection to Omega's to-be-filed Proof of Claim, are together referred to as the "Omega Actions."

8.     While the Omega Parties have yet to file their proof of claim, they have taken the position that only those "parties in interest with standing" will be able to object to their proof of claim.  (*See* Debtors' Reply to Official Committee of Unsecured Creditors' Objection and Reservation of Rights to Disclosure Statement, D.I. 454, ¶ 16).  In seeking the entry of an order to this effect, the Committee does not concede that preemptively obtaining standing to object to the Omega Parties' proof of claim—or to pursue all of the above-delineated claims—is necessary, but the Committee is proceeding with this Motion to avoid unnecessary, costly, and time consuming procedural objections.

9.     As discussed more fully below, all of the legal requirements for granting the Committee derivative standing to commence and prosecute the Omega Actions have been satisfied.  Prosecution of the Omega Actions is critical in this case because it will benefit the unsecured creditors by, among other things, (i) avoiding numerous fraudulent transfers, (ii) challenging the validity and priority of claims that improperly purport to be senior to those of the unsecured creditors, and (iii) creating a substantial source of recovery for the unsecured creditors.  Given the Debtors' inability to prosecute the Omega Actions, the Committee is the only party-in-interest qualified and sufficiently vested to litigate the adversary proceeding.

#48729463 v4

Accordingly, the Committee seeks authority to prosecute the Omega Actions against the Omega Parties and recover valuable estate assets for the benefit of the Debtors' unsecured creditors.

10.    The Committee did not demand that the Debtors commence and prosecute the Omega Actions because such a demand would be futile.  To date, the Debtors have not consented to the Committee's standing.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334(b).  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief requested herein are §§ 105(a), 1103(c), and 1109(b) of title 11 of the United States Code (the "Bankruptcy Code").

## THE OMEGA ACTIONS

12.    As set forth in more detail in the Draft Complaint, the Committee alleges, among other things, that the Debtors and the Omega Parties engaged in a series of transactions designed to benefit the Omega Parties and various Insiders and affiliates of the Debtors to the detriment of the Debtors' unsecured creditors.  These transactions included, among others, the execution of the LBO of the stock of 4 West's predecessors through the Agreement and Plan of Merger, the execution of the Sale Leaseback Agreement in connection with the LBO and the subsequent Master Leases between the Omega Parties and the Debtors, and the Working Capital Loan made from Omega to the Debtors.

13.    The Committee seeks to challenge these and other transactions on multiple grounds.  The Committee's Draft Complaint includes claims seeking:  (i) the avoidance and recovery of the fraudulent transfers made to the Omega Parties in connection with the LBO; (ii) a declaration that the Master Leases that effectuated the sale leaseback portion of the LBO are

actually secured financing agreements, and not "leases" under section 365 of the Bankruptcy Code, such that the Omega Defendants are secured creditors, not lessors; (iii) the avoidance and recovery of the fraudulent transfer made to the Omega Parties in connection with the Working Capital Loan; (iv) a declaration that Omega holds no lien on the payment to the Company's bankruptcy estate for the releases given under the Proposed Plan, on avoidance actions and unidentified tort claims, or on goodwill generated by the Company after the Petition Date; (v) an award of damages to the Company for each of the foregoing wrongs in an amount to be determined at trial, as well as the costs of pursuing these and other claims.

## RELIEF REQUESTED

14.    The Committee hereby requests that this Court grant the Committee leave, standing, and authority to commence and prosecute the Omega Actions, and sole authority to settle all or a portion of the Omega Actions, subject to Court approval, on behalf of the Debtors and their estates.

## BASIS FOR RELIEF

A.    **Standard for Derivative Standing**

15.    In the Fifth Circuit, under appropriate circumstances, "a creditors' committee has standing under Title 11, United States Code, section 1103(c)(5) and/or section 1109(b) to file suit on behalf of a debtor-in-possession or a trustee." *La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 247 (5th Cir. 1988) (citations omitted).  A committee may be granted standing where (i) the claim is colorable, (ii) the debtor-in-possession has refused unjustifiably to pursue the claim, and (iii) the committee first receives leave to sue from the bankruptcy court.  *Id.* (citation omitted).

#48729463 v4

**B.**    **The Committee Clearly Satisfies the Test for Derivative Standing**

**1.**    **The Omega Actions Are Colorable**

16.    The first element of the derivative standing test requires the Committee to demonstrate that colorable claims exist against the Omega Parties.  The case law construing the requirement for "colorable" claims clearly provides that the requisite showing is a relatively low threshold to satisfy.  *See*, *e.g.*, *Adelphia Commc'ns Corp. v. Bank of Am. (In re Adelphia Commc'ns Corp.)*, 330 B.R. 364, 376 (Bankr. S.D.N.Y. 2005) (holding that the requisite standard for presenting a "colorable" claim is relatively easy to meet and that the court need only be satisfied that there is "some factual support for the claims"); *Official Comm. of Unsecured Creditors of Am.'s Hobby Ctr. v. Hudson United Bank (In re America's Hobby Ctr.)*, 223 B.R. 275, 288 (Bankr. S.D.N.Y. 1998) (observing that only if the claim is "facially defective" should standing be denied); *In re Colfor, Inc.*, No. 96-60306, 1998 Bankr. LEXIS 158, at *7 (Bankr. N.D. Ohio Jan. 5, 1998) (stating that consistent with the common meaning of "colorable," that the claims to be asserted need only be "plausible" or "not without some merit").

17.    All of the Omega Actions alleged in the Draft Complaint are colorable.  As described in significant detail in the Draft Complaint, the Omega Parties caused the Debtors to engage in various transactions designed to benefit only the Omega Parties and certain Insiders of the Debtors, to the detriment of the Debtors and their unsecured creditors.  The Draft Complaint's allegations regarding the highly suspect nature of the various agreements and transaction documents, and the diversion of significant value away from the Debtors as a result, are more than sufficient to state "plausible" claims which are not "facially defective."

18.    By way of example, the Debtors already have conceded that the recharacterization claim as to the Omega leases is "viable."  *See* Debtors 9019 Motion, D.I. 101

-7-

at ¶ 27; *see also id.* at ¶ 18 ("There are various provisions in the Master Leases that suggest recharacterization may be appropriate . . . ."). Debtors cannot now question whether the recahracteriaztion claim is colorable.

19.    Similarly, Debtors' CRO Robichaux testified that he thought Omega's proof of claim was overstated by at least $50 million, thereby confirming that even the Debtors believe that objections to Omega's proof of claim are likely to succeed. *See* L. Robichaux, 4/12/2018 Depo. Tr. 108: 5-18.

20.    By way of further example, the fraudulent conveyance claim alleged against the Omega Parties in the Draft Complaint is supported by existing case law, including the holding of the 11th Circuit in *In re: TOUSA, Inc.*, 680 F.3d 1298 (11th Cir. 2012). In *In re TOUSA*, as is the case with respect to the LBO at issue here, the Debtors' subsidiaries which had conveyed the assets in question "were either insolvent, had unreasonably small capital, or were unable to pay their debts when the liens were conveyed." *Id.* at 3111. Moreover, regardless of any perceived benefit to a debtor parent company, with respect to the conveying subsidiaries, the "the almost certain costs of the transaction . . . far outweighed any perceived benefits." *Id.* In addition, as is the case here, given the Debtors' overleveraged condition at the outset, "the bankruptcy of TOUSA was far more like a slow-moving category 5 hurricane than an unforeseen tsunami." *Id.* at 1312; *see also Boyer v. Crown Stock Distrib.*, 587 F. 3d 787 (7th Cir. 2009) (affirming fraudulent conveyance claim in the context of an LBO and noting that liability should attach where "the acquired company [was] doomed to go broke after and because of the LBO").[2]

---

[2] The Debtors have raised statute of limitations arguments in the past with respect to the Committee's affirmative claims for fraudulent conveyance with respect to the LBO. The Committee does not believe those arguments will succeed. *See, e.g.*, *Ebner v. Kaiser (In re Kaiser)*, 525 B.R. 697, 712 (Bankr. D. Ill. 2014); *In re Tronox*, 503 B.R. 239, 274-75 (Bankr. S.D.N.Y. 2013)). Regardless, any argument for the application of the statute of limitations

-8-

21.     The challenges to the extent of Omega's secured interest are also grounded in case law, including *In re Residential Capital*, 501 B.R. 549 (Bankr. S.D.N.Y. 2013) (finding that claimants did not have a lien on goodwill generated after the petition date.).

22.     The Committee expects that the proposed Omega Actions will only become stronger upon the receipt of more discovery, including documents that are the subject of a pending motion to compel, as well as depositions.

**2.      Demand on the Debtors Should Be Excused**

23.     The second element of the derivative standing test requires that the Debtors unjustifiably and unreasonably refuse the Committee's demand that the Debtor assert the Omega Actions.  Where claims for which the Committee seeks standing would benefit the estate, such as the Omega Actions, courts will generally grant derivative standing if the Debtor unjustifiably refuses to pursue such claims.  *See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003).

24.     However, case law makes clear that a committee need not formally demand that a debtor take action where it is clear that such action would be futile.  *In re La. World Exposition*, 832 F.2d 1391, 1397-98 (5th Cir. 1987) (declining to remand case so committee could make formal demand upon debtor where conflicts would likely prevent debtor from pursuing litigation adverse to its directors and officers); *see also In re First Capital*

would not succeed with respect to the Committee's objection to Omega's proof of claim.  The potential disallowance, reduction or subordination of the Omega Claim may be asserted as an objection to a proof of claim pursuant to section 502(d), even where an affirmative fraudulent transfer claim is time-barred under the applicable statute of limitations.  *See RSL-3B-IL, Ltd. v. Symetra Life Ins. Co.*, 2017 U.S. Dist. LEXIS 216851, at *5 (S.D. Tex. July 26, 2017) (permitting fraudulent transfer defense to be asserted in opposition to a proof of claim, even though the statute of limitations for such claim had expired); *Litzler v. Cooper (In re Margaux Tex. Ventures, Inc.)*, 545 B.R. 506, 529 (Bankr. N.D. Tex. 2014) ("[T]he Trustee can utilize section 502(d) defensively to attempt to disallow the Defendant's Claim even though the section 546(a) statute of limitations period has already passed.").

*Holdings Corp.*, 146 B.R. 7, 13 (Bankr. C.D. Cal. 1992) (finding creditors' committee excused

from making demand on debtor to pursue action against debtor's officers, directors and

controlling shareholders where such demand would be futile).

   25.  It would be futile in this case for the Committee to demand that the

Debtors commence and prosecute the Omega Actions because the individuals controlling the

Debtors have already reached a self-interested deal with the Omega Parties the terms of which

preclude them from bringing the claims contemplated by the Committee. In addition, the

Debtors made stipulations in the Court-approved DIP Financing Order as to the nature, extent,

validity, and priority of the Omega Parties' secured claims and liens that are inconsistent with the

position the Committee will take in the Omega Actions. Debtors suffer from an irreconcilable

conflict, and indeed a contractual obligation, that prevents the Debtors from bringing the Omega

Actions and renders futile any formal demand on the Debtors to pursue such claims.[3]

   26.  The futility of demand in this case fully satisfies the second element of the

derivative standing test.

   **3.**  **The Committee is Seeking Prior Court Approval to Commence and
Prosecute the Omega Actions**

   27.  Finally, the requirement that the Committee should obtain court approval

prior to asserting claims on behalf of the estate is satisfied by the relief sought herein.

**C.**  **Additional Considerations**

   28.  Granting the Committee standing to commence and prosecute the Omega

Actions is also critical to the Committee's ability to properly discharge its fiduciary duties.

These duties include "perform[ing] such services as are in the interest of those represented." 11

---

[3] The fact that Debtors appointed an Independent Director subsequent to negotiating the
Settlement Agreement, RSA, DIP Financing Order, and Plan does not change the demand futility
analysis given the stipulations already reached by Debtors.

U.S.C. § 1103(c)(5). Courts are flexible in interpreting these duties in order to allow a committee to "pursu[e] whatever lawful course best serves the interests of the class of creditors represented." *In re TSIC, Inc.*, 393 B.R. 71, 78 (Bankr. D. Del. 2008) (citing *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1315-16 (1st Cir. 1993)).

29.    In order to properly discharge its fiduciary duties, and due to the Debtors' inability to commence and prosecute the Omega Actions, the Committee seeks standing to prosecute the Omega Actions on behalf of the Debtors' estates.

30.    The Committee is the appropriate party to commence and prosecute the Omega Actions because its purpose is to defend the interests of the unsecured creditors and to ensure that the assets of the estate are maximized for those unsecured creditors. *See, e.g., In re Nationwide Sports Distrib., Inc.*, 227 B.R. 455, 463 (Bankr. E.D. Pa. 1998) ("[T]he purpose of such [unsecured creditors'] committees is to represent the interests of unsecured creditors and to strive to maximize the bankruptcy dividend paid to that class of creditors."). The unsecured creditors represented by the Committee have a significant stake in the outcome of the litigation relating to the Omega Actions and, thus, the Committee, as opposed to any other party, is best positioned to pursue the claims.

31.    The Committee believes the potential recovery from the Omega Actions represents a valuable pool of assets that may be used to reduce or satisfy the claims asserted by the Debtors' unsecured creditors. Moreover, the Committee does not expect that the costs and expenses to be incurred in connection with prosecuting the Omega Actions will be excessive in relation to the potential recovery for the estate. Although litigation costs are a factor for courts to consider, the Committee need only demonstrate to the Court that the prosecution of the Omega Actions represents a sensible expenditure of the estates' resources. *See In re Adelphia*

*Commc'ns Corp.*, 330 B.R. at 383. Here, where the potential benefits to the Debtors' estates and their unsecured creditors are potentially worth tens of millions of dollars, the benefits of prosecuting the Omega Actions clearly outweigh the costs incurred in connection therewith.

**D.      The Committee Should be Granted Sole Authority to Settle the Claims**

32.      As the Debtors are conflicted and contractually prevented from pursuing the Omega Actions, the Debtors should not retain any rights to settle or otherwise compromise the Omega Actions if the Committee is granted leave to commence and prosecute such claims against the Omega Parties.

## RESERVATION OF RIGHTS

33.      The Committee reserves its right to amend the Motion and the Draft Complaint. The Committee further reserves its right to file claims and objections without receipt of an order granting standing. Lastly, the Committee also reserves its right to seek standing in the future as to other claims not contemplated by this Motion.

## NOTICE

34.      This Motion has been served on (i) the Office of the United States Trustee for the Northern District of Texas, (ii) the Debtors and their counsel, (iii) Omega, (iv) the Plan Sponsor, and (v) all entities that have filed a request for service of filings pursuant to Bankruptcy Rule 2002.

## NO PRIOR REQUEST

35.      No prior application for the relief sought in this Motion has been made to this or any other court in connection with this case.

**WHEREFORE**, the Committee requests that the Court enter an order, (attached as Exhibit A) (i) granting the Committee leave, standing and authority to commence and prosecute the Omega Actions, (ii) granting the Committee exclusive authority to compromise

#48729463 v4

and settle the Omega Actions, subject to Court approval, and (iii) providing the Committee such

other and further relief as the Court may deem just, proper and equitable.

Respectfully submitted,

Dated:  May 29, 2018

*/s/ Ryan E. Manns*

Louis R. Strubeck, Jr.
Ryan E. Manns
Norton Rose Fulbright US LLP
2200 Ross Avenue, Suite 3600
Dallas, TX 75201-7932
Telephone:    (214) 855-8000
Facsimile:    (214) 855-8200
Email: louis.strubeck@nortonrosefulbright.com
          ryan.manns@nortonrosefulbright.com

-and-

Francis J. Lawall (admitted *pro hac vice*)
Donald J. Detweiler (admitted *pro hac vice*)
Joanna J. Cline (admitted *pro hac vice*)
Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE 19899-1709
Telephone:    (302) 777-6500
Facsimile:    (302) 421-8390
E-mail: lawallf@pepperlaw.com
          detweild@pepperlaw.com
          clinej@pepperlaw.com

*Counsel to the Official Committee of Unsecured
Creditors*

#48729463 v4

**<u>EXHIBIT A</u>**

#48729463 v4

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| 4 WEST HOLDINGS, INC., *et al.*, | ) | Case No. 18-30777-(HDH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## ORDER GRANTING OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION FOR STANDING TO PURSUE DERIVATIVE CLAIMS AGAINST THE OMEGA PARTIES ON BEHALF OF THE DEBTORS' ESTATES

CAME ON to be considered the *Official Committee of Unsecured Creditors'*

*Motion for Standing to Pursue Derivative Claims Against the Omega Parties on Behalf of the*

*Debtors' Estates* (the "Motion"),[4] and having reviewed the Motion and all other papers related

thereto heretofore filed; and this Court having jurisdiction to consider the Motion; and venue

being proper; and notice of the Motion having been sufficient; and the relief requested in the

Motion being warranted, IT IS HEREBY ORDERED THAT:

1. The Motion is GRANTED;

---

[4] Capitalized terms not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

-15-

#48729463 v4

2.    The Committee possesses standing to pursue any cause of action and assert any defense in these cases arising under the Bankruptcy Code, other applicable law or at equity, including, without limitation, claims to avoid transfers, recover money judgments, or otherwise, provided such claim, cause of action or defense is:  (i) against one or more of the Omega Parties; (ii) tangential or related to a claim or defense against one or more of the Omega Parties; or (iii) that is reasonably necessary to obtain adequate relief against one or more of the Omega Parties;

3.    Nothing in this Order, nor in the Motion, shall be deemed to prejudice or estop in any respect the Committee's rights to assert any cause of action against any party or to allege any fact in connection therewith, all of which rights are expressly reserved hereby; and

4.    This Court shall retain jurisdiction over all matters arising from the implementation and/or interpretation of this Order.

IT IS SO ORDERED

## END OF ORDER ##

#48729463 v4

**<u>EXHIBIT A</u>**

Louis R. Strubeck, Jr.
Ryan E. Manns
**Norton Rose Fulbright US LLP**
2200 Ross Avenue
Suite 3600
Dallas, TX 75201-7932
Email: louis.strubeck@nortonrosefulbright.com
        ryan.manns@nortonrosefulbright.com

Francis J. Lawall (admitted *pro hac vice*)
Donald J. Detweiler (admitted *pro hac vice*)
Joanna J. Cline (admitted *pro hac vice*)
**Pepper Hamilton LLP**
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE 19899-1709
E-mail: lawallf@pepperlaw.com
        detweild@pepperlaw.com
        clinej@pepperlaw.com

*Counsel to the Official Committee of
Unsecured Creditors*

| | |
|---|---|
| In re:<br><br>4 WEST HOLDINGS, INC., *et al.*,<br><br>      Debtors. | Chapter 11<br><br>Case No. 18-30777-(HDH)<br><br>(Jointly Administered) |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, on behalf of 4 WEST HOLDINGS, INC., *ET AL.*, Debtors in Possession<br><br>      Plaintiff,<br><br>      v.<br><br>OMEGA HEALTHCARE INVESTORS, INC., a Maryland corporation, OHI ASSET RO, LLC, a Delaware limited liability company, OHI ASSET (MS) CLEVELAND, LLC, a Delaware limited liability company, OHI ASSET (MS) CLINTON, LLC, a Delaware limited liability company, OHI ASSET (MS) COLUMBIA, LLC, a Delaware limited liability company OHI ASSET (MS) CORINTH, LLC, a Delaware limited liabiilty company, OHI ASSET (MS) BYHALIA, LLC, a Delaware limited liability company OHI ASSET (MS) GREENWOOD, LLC, a Delaware limited liability company OHI ASSET (MS) GRENADA, LLC, a Delaware | Adv. Pro. No. [__-_____-(HDH)] |

limited liabiilty company, OHI ASSET (MS)
HOLLY SPRINGS, LLC, a Delaware limited
liability company OHI ASSET (MS)
INDIANOLA, LLC, a Delaware limited
liability company OHI ASSET (MS)
NATCHEZ, LLC, a Delaware limited liability
company OHI ASSET (MS) PICAYUNE,
LLC, a Delaware limited liability company
OHI ASSET (MS) VICKSBURG, LLC, a
Delaware limited liability company OHI
ASSET (MS) YAZOO CITY, LLC, a
Delaware limited liability company OHI
ASSET (SC) EDGEFIELD, LLC, a Delaware
limited liability company OHI ASSET (VA)
CHARLOTTESVILLE, LLC, a Delaware
limited liability company OHI ASSET (VA)
FARMVILLE, LLC, a Delaware limited
liability company OHI ASSET (VA)
HILLSVILLE, LLC, a Delaware limited
liability company OHI ASSET (VA) ROCKY
MOUNT, LLC, a Delaware limited liability
company OHI ASSET (SC) PICKENS EAST
CEDAR, LLC, a Delaware limited liability
company, OHI ASSET (SC) GREENVILLE
NORTH, LLC, a Delaware limited liability
company, OHI ASSET (SC) SIMPSONVILLE
SE MAIN, LLC, a Delaware limited liability
company, OHI ASSET (SC) EASLEY
CRESTVIEW, LLC, a Delaware limited
liability company, OHI ASSET (SC) EASLEY
ANNE, LLC, a Delaware limited liability
company, OHI ASSET (SC) PIEDMONT,
LLC, a Delaware limited liability company,
OHI ASSET (SC) GREENVILLE LAURENS,
LLC, a Delaware limited liability company,
OHI ASSET (SC) ANDERSON, LLC, a
Delaware limited liability company, OHI
ASSET (SC) SIMPSONVILLE WEST
CURTIS, LLC, a Delaware limited liability
company, OHI ASSET (SC) SIMPSONVILLE
WEST BROAD, LLC, a Delaware limited
liability company, OHI ASSET (SC)
PICKENS ROSEMOND, LLC, a Delaware
limited liability company, OHI ASSET (SC)
AIKEN, LLC, a Delaware limited liability
company, OHI ASSET (SC) GREER, LLC, a

Delaware limited liability company, OHI ASSET (SC) MARIETTA, LLC, a Delaware limited liability company, OHI ASSET (SC) MCCORMICK, LLC, A DELAWARE LIMITED LIABILITY COMPANY OHI ASSET (TN) BARTLETT, LLC, a Delaware limited liability company, OHI ASSET (TN) COLLIERVILLE, LLC, a Delaware limited liability company, OHI ASSET (GA) SNELLVILLE, LLC, a Delaware limited liability company, OHI ASSET (GA) MOULTRIE, LLC, a Delaware limited liability company, OHI ASSET (NC) WADESBORO, LP (f/k/a OHI ASSET (NC) WADESBORO, LLC), a Delaware limited partnership, OHI ASSET (TN) MEMPHIS, LLC, a Delaware limited liability company, OHI ASSET (SC) GREENVILLE GRIFFITH, LLC, a Delaware limited liability company, OHI ASSET (IN) CONNERSVILLE, LLC, a Delaware limited liability company, OHI ASSET (ID) HOLLY, LLC, a Delaware limited liability company, OHI ASSET (ID) MIDLAND, LLC, a Delaware limited liability company, OHI ASSET (OR) PORTLAND, LLC, a Delaware limited liability company, OHI ASSET (UT) PROVO, LLC, a Delaware limited liability company,  OHI ASSET (UT) ROY, LLC, a Delaware limited liability company, OHI ASSET (UT) OGDEN, LLC, a Delaware limited liability company, OHI ASSET (WA) BATTLE GROUND, LLC, a Delaware limited liability company,  OHI ASSET (TX) ANDERSON, LLC, a Delaware limited liability company, OHI ASSET (TX) BRYAN, LLC, a Delaware limited liability company, OHI ASSET (TX) BURLESON, LLC, a Delaware limited liability company, OHI ASSET (TX) COMFORT, LLC, a Delaware limited liability company, OHI ASSET (TX) DIBOLL, LLC, a Delaware limited liability company, OHI ASSET (TX) GRANBURY, LLC, a Delaware limited liability company, OHI ASSET (TX) ITALY, LLC, a Delaware limited liability company, OHI ASSET (TX) COLLEGE STATION, LLC, a Delaware

-20-

limited liability company, OHI ASSET (TX)
WINNSBORO, LLC, a Delaware limited
liability company

Defendants.

Plaintiff, the Official Committee of Unsecured Creditors (the "**Committee**") of 4

West Holdings, Inc. ("**4 West**") and its affiliated debtors and debtors in possession[5] ("**Debtors**"

or the "**Company**"), on behalf of the Debtors, hereby brings this adversary proceeding against

defendants Omega Healthcare Investors, Inc., OHI Asset RO, LLC, OHI Asset (MS) Cleveland,

LLC, OHI Asset (MS) Clinton, LLC, OHI Asset (MS) Columbia, LLC, OHI Asset (MS) Corinth,

LLC, OHI Asset (MS) Byhalia, LLC, OHI Asset (MS) Greenwood, LLC, OHI Asset (MS)

Grenada, LLC, OHI Asset (MS) Holly Springs, LLC, OHI Asset (MS) Indianola, LLC, OHI

Asset (MS) Natchez, LLC, OHI Asset (MS) Picayune, LLC, OHI Asset (MS) Vicksburg, LLC,

OHI Asset (MS) Yazoo City, LLC, OHI Asset (SC) Edgefield, LLC, OHI Asset (VA)

Charlottesville, LLC, OHI Asset (VA) Farmville, LLC, OHI Asset (VA) Hillsville, LLC, OHI

Asset (VA) Rocky Mount, LLC, OHI Asset (SC) Pickens East Cedar, LLC, OHI Asset (SC)

Greenville North, LLC, OHI Asset (SC) Simpsonville SE Main, LLC, OHI Asset (SC) Easley

Crestview, LLC, OHI Asset (SC) Easley Anne, LLC, OHI Asset (SC) Piedmont, LLC, OHI

Asset (SC) Greenville Laurens, LLC, OHI Asset (SC) Anderson, LLC, OHI Asset (SC)

Simpsonville West Curtis, LLC, OHI Asset (SC) Simpsonville West Broad, LLC, OHI Asset

(SC) Pickens Rosemond, LLC, OHI Asset (SC) Aiken, LLC, OHI Asset (SC) Greer, LLC, OHI

Asset (SC) Marietta, LLC, OHI Asset (SC) McCormick, LLC, OHI Asset (TN) Bartlett, LLC,

OHI Asset (TN) Collierville, LLC, OHI Asset (GA) Snellville, LLC, OHI Asset (GA) Moultrie,

LLC, OHI Asset (NC) Wadesboro, LP (f/k/a OHI Asset (NC) Wadesboro, LLC), OHI Asset

---

[5] A list of the Debtors is attached hereto as **Exhibit A**.

#48729463 v4

(TN) Memphis, LLC, OHI Asset (SC) Greenville Griffith, LLC, OHI Asset (IN) Connersville, LLC, OHI Asset (ID) Holly, LLC, OHI Asset (ID) Midland, LLC, OHI Asset (OR) Portland, LLC, OHI Asset (UT) Provo, LLC, OHI Asset (UT) Roy, LLC, OHI Asset (UT) Ogden, LLC, OHI Asset (WA) Battle Ground, LLC,  OHI Asset (TX) Anderson, LLC, OHI Asset (TX) Bryan, LLC, OHI Asset (TX) Burleson, LLC, OHI Asset (TX) Comfort, LLC, OHI Asset (TX) Diboll, LLC, OHI Asset (TX) Granbury, LLC, OHI Asset (TX) Italy, LLC, OHI Asset (TX) College Station, LLC, OHI Asset (TX) Winnsboro, LLC (collectively "**Omega**" or "**Omega Parties**") and alleges as follows:

## NATURE OF ACTION

1.      This is an action seeking to maximize the recovery of unsecured creditors who hold more than $ 100 million of unpaid claims in the above-captioned chapter 11 cases.

2.      By this action, the Committee seeks to recover the shortfall imposed on such creditors in the wake of a leveraged buyout ("**LBO**") and related subsequent transactions, beginning in 2013.

3.      The LBO consisted of a sale leaseback agreement and related transactions orchestrated by the Schwartzberg Family, pursuant to which the Schwartzberg Family Trusts acquired the stock of Ark Holding Company, Inc., also known as Covenant Dove ("**Ark**" or "**Covenant Dove**"),  with the proceeds of a $525 million financing transaction with the Omega Parties secured by the assets of the Debtors.  Certain Omega Parties then became nominal "landlords" with respect to the facilities owned by the Debtors, and "leased" the facilities back to certain Debtor entities pursuant to long term Master Leases.

4.      As a result of the LBO, the former stockholders of the Company received approximately $239 million; the Omega Parties received title to the facilities owned by the

Debtors and a lien on the related assets; and the Schwartzberg Family Trusts received the stock of the Company without having put in any capital of their own.

5.    The Debtor entities on which the Schwartzbergs preyed to finance the LBO did not receive reasonably equivalent value in exchange for the assets they relinquished to Omega.

6.    As a result of the transactions, the secured debt obligations of Debtors increased from approximately $267 million to $529 million, and the Company was left with $0 stockholders' equity.

7.    The Omega Parties and the Schwartzbergs knowingly designed the transaction as a leveraged buyout—the existing stockholders' equity would be replaced by debt, with the level of risk facing the newly structured corporation rising significantly due to the increased debt to equity ratio.

8.    With the former stockholders, including Behrman Capital PEP L.P. ("**Behrman Capital**"), cashed out, the Omega Parties protected by title to and liens on the assets of the subsidiary entities, and the Schwartzberg Family Trusts able to effectuate the transaction without coming out of pocket, the parties knew the increased risk of operating as a highly leveraged entity would be borne by the unsecured creditors.

9.    As Debtors' CRO Loius Robichaux testified at the First Day Hearing, the Debtors were "overleveraged from the inception, from the time the current owners purchased the company."

10.    The LBO left the Company insolvent and without the capital necessary to survive—indeed, without any capital at all.

#48729463 v4

11.     Although Debtors limped along for a few years, they never achieved financial stability.  Predictably, unsecured trade debt continued to accumulate from accounts payable and accrued expenses of $37 million at the end of 2013 to $64 million at the end of 2017.  Stockholders' equity grew increasingly negative, from negative $3 million at the end of 2013 to negative $164 million at the end of 2017, and eventually Debtors even took out a working capital loan from Omega for the purpose of being able to pay rent back to Omega.

12.     Omega and the Schwartzberg-owned entities that controlled the Debtors started negotiating a restructuring agreement in August 2017.  Rather than work to quickly implement a solution, however, the parties continued to negotiate until after the expiration of the four-year anniversary of the LBO, and Debtors did not file for chapter 11 protection until March 2018.

13.     By this action, the Committee seeks:  (i) the avoidance and recovery of the fraudulent transfers made to the Omega Parties in connection with the LBO (as defined herein); (ii) a declaration that the Master Leases that effectuated the sale leaseback portion of the LBO are actually secured financing agreements, not "leases" under section 365 of the Bankruptcy Code, such that the Omega Defendants are secured creditors, not lessors; (iii) the avoidance and recovery of the fraudulent transfer made to the Omega Parties in connection with the Working Capital Loan (as defined herein); (iv) a declaration that Defendant holds no lien on the payment to the Company's bankruptcy estate for the releases given under the Proposed Plan, on avoidance actions and unidentified tort claims, or on goodwill generated by the Company after the Petition Date; (v) an award of damages to the Company for each of the foregoing wrongs in an amount to be determined at trial; and (vi) an award of attorneys' fees, legal costs, and other expenses incurred by Plaintiff in connection with this action.

-24-

## JURISDICTION AND VENUE

14.     This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This action is a core proceeding pursuant to 28 U.S.C. § 157(b).

15.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES AND RELEVANT NON-PARTIES

### DEBTOR ENTITIES AND AFFILIATES

16.     Plaintiff 4 West is a Delaware corporation, with its principal place of business in Nashville, Tennessee.  4 West does business as "Orianna Health Systems, Inc" and is in the business of operating 41 skilled nursing facilities ("**SNFs**") and managing one SNF in the seven states of Georgia, Indiana, Mississippi, North Carolina, South Carolina, Tennessee and Virginia.

17.     4 West is wholly owned by 4 West Investors, LLC.  4 West Investors, LLC in turn is owned in its entirety by three Schwartzberg family trusts—HS New Ark Trust, JS New Ark Trust, and DES New Ark Trust (the "**Schwartzberg Family Trusts**").

18.     4 West wholly owns several subsidiary holding companies ("**HoldCos**"). Those holding companies, in turn, hold over 100 operating and property companies ("**OpCos**" and "**PropCos**", respectively).  Generally speaking there is one OpCo and one PropCo for each SNF operated by Debtors.

19.     The OpCos hold licenses and other assets necessary to operate each SNF, and are certified to participate in Medicare and Medicaid programs.

20.     The PropCos are nominally "tenants" who pay "rent" to Omega subsidiaries with respect to the real property on which each respective facility is housed.

21.     Health Care Navigator LLC ("**HCN**") is a non-Debtor entity owned by Schwartzberg family trusts that are affiliated with the Schwartzberg Family Trusts that ultimately own the Debtors.  HCN provides consulting, in-house legal, back-office administrative and other advisory services to Debtors and to other entities ultimately owned or controlled by the Schwartzberg Companies.

<u>THE COMMITTEE</u>

22.     On March 19, 2018, the Committee was appointed by the Office of the United States Trustee (the "**U.S. Trustee**") to represent the interest of unsecured creditor in the Debtors' bankruptcy cases.  The U.S. Trustee appointed Pharmerica Corporation, Healthcare Service Group, Medline Industries, Alana Healthcare, Omnicare, Inc., Joerns Healthcare LLC and Regional Ambulance as members of the Committee.

23.     On May [__], 2018, the Committee filed a motion for standing to bring this action, and standing was granted by order of this Court on [____ __], 2018.  *See* Main Docket No. [____].

<u>THE OMEGA DEFENDANTS</u>

24.     Defendant Omega Healthcare Investors, Inc. ("**OHI**") is a Maryland corporation and is a publicly traded real estate investment trust ("**REIT**") that invests in SNFs.

25.     Defendant OHI Asset RO, LLC is a Delaware limited liability company and affiliate of OHI.

26.     The following Defendants are all affiliates of OHI and are nominal landlords under that certain Master Lease for the South East Region (the "**South East Master Lease**"):

#48729463 v4

a.    OHI Asset (MS) Cleveland, LLC, a Delaware limited liability company;

b.    OHI Asset (MS) Clinton, LLC, a Delaware limited liability company;

c.    OHI Asset (MS) Columbia, LLC, a Delaware limited liability company;

d.    OHI Asset (MS) Corinth, LLC, a Delaware limited liability company;

e.    OHI Asset (MS) Byhalia, LLC, a Delaware limited liability company;

f.    OHI Asset (MS) Greenwood, LLC, a Delaware limited liability company;

g.    OHI Asset (MS) Grenada, LLC, a Delaware limited liability company;

h.    OHI Asset (MS) Holly Springs, LLC, a Delaware limited liability company;

i.    OHI Asset (MS) Indianola, LLC, a Delaware limited liability company;

j.    OHI Asset (MS) Natchez, LLC, a Delaware limited liability company;

k.    OHI Asset (MS) Picayune, LLC, a Delaware limited liability company;

-27-

l.      OHI Asset (MS) Vicksburg, LLC, a Delaware limited liability company;

m.      OHI Asset (MS) Yazoo City, LLC, a Delaware limited liability company;

n.      OHI Asset (SC) Edgefield, LLC, a Delaware limited liability company;

o.      OHI Asset (VA) Charlottesville, LLC, a Delaware limited liability company;

p.      OHI Asset (VA) Farmville, LLC, a Delaware limited liability company;

q.      OHI Asset (VA) Hillsville, LLC, a Delaware limited liability company;

r.      OHI Asset (VA) Rocky Mount, LLC, a Delaware limited liability company;

s.      OHI Asset (SC) Pickens East Cedar, LLC, a Delaware limited liability company;

t.      OHI Asset (SC) Greenville North, LLC, a Delaware limited liability company;

u.      OHI Asset (SC) Simpsonville SE Main, LLC, a Delaware limited liability company;

v.      OHI Asset (SC) Easley Crestview, LLC, a Delaware limited liability company;

w.    OHI Asset (SC) Easley Anne, LLC, a Delaware limited liability company;

x.    OHI Asset (SC) Piedmont, LLC, a Delaware limited liability company;

y.    OHI Asset (SC) Greenville Laurens, LLC, a Delaware limited liability company;

z.    OHI Asset (SC) Anderson, LLC, a Delaware limited liability company;

aa.    OHI Asset (SC) Simpsonville West Curtis, LLC, a Delaware limited liability company;

bb.    OHI Asset (SC) Simpsonville West Broad, LLC, a Delaware limited liability company;

cc.    OHI Asset (SC) Pickens Rosemond, LLC, a Delaware limited liability company;

dd.    OHI Asset (SC) Aiken, LLC, a Delaware limited liability company;

ee.    OHI Asset (SC) Greer, LLC, a Delaware limited liability company;

ff.    OHI Asset (SC) Marietta, LLC, a Delaware limited liability company;

gg.    OHI Asset (SC) McCormick, LLC, a Delaware limited liability company;

hh.    OHI Asset (TN) Bartlett, LLC, a Delaware limited liability company;

#48729463 v4

      ii.      OHI Asset (TN) Collierville, LLC, a Delaware limited liability company;

      jj.      OHI Asset (GA) Snellville, LLC, a Delaware limited liability company;

      kk.      OHI Asset (GA) Moultrie, LLC, a Delaware limited liability company;

      ll.      OHI Asset (NC) Wadesboro, LP (f/k/a OHI Asset (NC) Wadesboro, LLC), a Delaware limited partnership;

      mm.      OHI Asset (TN) Memphis, LLC, a Delaware limited liability company;

      nn.      OHI Asset (SC) Greenville Griffith, LLC, a Delaware limited liability company;

27.      The following Defendants are all affiliates of OHI and are nominal landlords under that certain Master Lease for the Indiana Region (the "**Indiana Master Lease**"):

      a.      OHI Asset (IN) Connersville, LLC, a Delaware limited liability company;

28.      The following Defendants are all affiliates of OHI and are nominal landlords under that certain Master Lease for the North West Region (the "**North West Master Lease**"):

      a.      OHI Asset (ID) Holly, LLC, a Delaware limited liability company;

      b.      OHI Asset (ID) Midland, LLC, a Delaware limited liability company;

#48729463 v4

c.      OHI Asset (OR) Portland, LLC, a Delaware limited liability company;

d.      OHI Asset (UT) Provo, LLC, a Delaware limited liability company;

e.      OHI Asset (UT) Roy, LLC, a Delaware limited liability company;

f.      OHI Asset (UT) Ogden, LLC, a Delaware limited liability company;

g.      OHI Asset (WA) Battle Ground, LLC, a Delaware limited liability company;

29.      The following Defendants are all affiliates of OHI and are nominal landlords under that certain Master Lease for the Texas Region (the "**Texas Master Lease**"):

a.      OHI Asset (TX) Anderson, LLC, a Delaware limited liability company;

b.      OHI Asset (TX) Bryan, LLC, a Delaware limited liability company;

c.      OHI Asset (TX) Burleson, LLC, a Delaware limited liability company;

d.      OHI Asset (TX) Comfort, LLC, a Delaware limited liability company;

e.      OHI Asset (TX) Diboll, LLC, a Delaware limited liability company;

f.      OHI Asset (TX) Granbury, LLC, a Delaware limited liability company;

#48729463 v4

g.   OHI Asset (TX) Italy, LLC, a Delaware limited liability company;

h.   OHI Asset (TX) College Station, LLC, a Delaware limited liability company;

i.   OHI Asset (TX) Winnsboro, LLC,  a Delaware limited liability company;

## FACTUAL ALLEGATIONS

### 1.   The Origins Of 4 West

30.   Ark, also known as Covenant Dove, was acquired in July 2007 by Behrman Capital.  It provided long-term care and rehabilitation services in SNFs primarily in the Southeast region of the United States.

31.   Under the Covenant Dove umbrella were a number of holding companies, which indirectly held, with respect to each SNF facility, an operating company and a property company.

32.   The Covenant Dove operating companies each owned various licenses and other assets necessary to operate each SNF.

33.   The Covenant Dove property companies each owned title to the real property on which each respective facility was housed.

### 2.   2013 Merger and Sale Leaseback Transactions

34.   In 2013, Behrman Capital sought to exit its investment in Covenant Dove.

35.   Behrman Capital retained investment banking firm Jefferies LLC to assist with marketing the sale.

36.   Jefferies identified Red Oak Acquisitions, another entity owned/controlled by the Schwartzbergs, as the buyer.

-32-

37.     Omega, which already was financing another group of SNFs operated by the Schwartzbergs (Schwartzberg affiliate Gulf Coast), was identified as a source of financing for the transaction.

38.     Omega, at the time a relatively small REIT, was very interested in financing a transaction with Covenant Dove because it thought the transaction would serve as an excellent prototype for future large portfolio acquisitions normally not practicable because of tax repercussions.

39.     Omega saw the transaction as a chance to add considerable size and diversity to its portfolio, including facilities in four states in which Omega did not already have a presence.

40.     Given the potential upside for its larger business plan, Omega was eager to proceed with the transaction even though it knew that the Gulf Coast SNF entities already being run by the Schwartzbergs were experiencing financial difficulty.

41.     Omega did very little of its own due diligence with respect to the proposed acquisition, instead relying largely on the due diligence completed by Schwartzberg affiliate Red Oak Acquisitions.

42.     Upon information and belief, the due diligence materials utilized to justify the transaction were either intentionally or negligently deficient in revealing the operational track record of the Schwartzberg entities and their affiliates who were involved in running SNF facilities.

43.     Tellingly, Omega did not secure an independent solvency opinion, which is surprising given the lack of any equity capital on the balance sheet post-transaction.

#48729463 v4

44.    At the same time, upon information and belief, the Schwartzberg Family Trusts saw the acquisition of Covenant Dove as an opportunity for significant upside with very little risk.

45.    For the Schwartzberg Companies, the transaction would provide a means of growing the SNF operation business, as well as provide an additional stream of income for the Schwartzberg-affiliated companies that provided ancillary services to its SNF operators (namely, HCN; Halcyon Rehabilitation, LLC—a Schwartzberg-owned entity that provides therapy services; and HMS Purchasing, LLC—a Schwartzberg-owned group purchaser of medical supplies, food, equipment, and other items).

46.    As part of the "scheme," these affiliates of the Debtors, HCN, HMS, and Halcyon, were put in place to provide ancillary services for which they charged millions of dollars to the detriment of the Debtors.

47.    4 West itself was created by Trey Blalock, the Chief Legal Officer of Schwartzberg-owned HCN, in August 2013, for the purpose of effectuating a transaction pursuant to which Schwartzberg Family Trusts would become the beneficial owners of the stock of Ark.

48.    Rather than put in capital of their own to effectuate the transaction, the Schwartzberg Family Trusts, working with an Omega affiliate as lender, effectuated a leveraged buyout.

49.    Through a series of entities and transactions further described below, 4 West (wholly owned by the three Schwartzberg Family Trusts) borrowed $525 million from Omega to acquire the stock of Ark, at the same time conveying title to the assets held by the subsidiaries of Ark to Omega as security for the financing.

50.     As a result of the transactions:  the former stockholders of Ark, including Behrman Capital, received approximately $239 million; Omega received title to the SNFs and a lien on the related assets; the Schwartzberg Family Trusts received the stock of Ark (now known as Orianna Investment, Inc.); and the 4 West subsidiaries did not receive reasonably equivalent value in exchange for the property they gave up.

51.     Indeed, in the wake of the transactions, the Company was left with $0 stockholders' equity, down from $193 million in stockholders equity prior to the transactions, as well as long-term debt that increased from $267 million prior to the transactions to $529 million after closing.

52.     By way of further detail, 4 West entered into an Agreement and Plan of Merger (the "**Merger Agreement**", and the transactions contemplated thereby, the "**Merger**") dated September 13, 2013, with Ark, New Ark Investment, Inc. ("**New Ark**"),  and Behrman Capital, as representative of the Ark stockholders (the "**Ark Stockholders**").

53.     As a result of the Merger, New Ark merged into Ark, and Ark became wholly owned by 4 West.  Ark later changed its name to Orianna Investment, Inc.

54.     The Merger Agreement was conditioned on the completion of the sale leaseback transaction pursuant to the Sale Leaseback Agreement, also dated September 13, 2013, among 4 West, New Ark and OHI Asset RO, LLC, a wholly-owned subsidiary of Omega Healthcare Investors, Inc.

55.     Although the transactions under the Merger Agreement and the Sale Leaseback Agreement were effectively simultaneous, the documents provided that the sale leaseback would occur immediately prior to the merger.

56.     Under the Sale Leaseback Agreement, Omega paid a purchase price of $525 million, in exchange for which 4 West and New Ark caused the PropCos (indirect subsidiaries of Ark) to transfer their assets to Omega.

57.     Even though 4 West would not obtain control of these entities until the Merger was complete, the proceeds from the sale were used by 4 West to repay some of the existing indebtedness of Ark and its subsidiaries, pay the merger consideration to the Ark Stockholders, and to pay various transaction expenses.

58.     Subsidiaries of Omega then entered into four master leases with the PropCos now owned by 4 West.

59.     These four master leases were divided by region: South East, North West, Indiana and Texas (collectively, the "**Master Leases**").

60.     Pursuant to these Master Leases, the 4 West PropCos became nominal tenants who paid "rent" to Omega as a means of effectively repaying the $525 million purchase price for Covenant Dove.  However, the monthly amount paid was not sufficient to cover the amount actually due to Omega. (By way of example, with respect to the South East Master Lease, the "balance outstanding" on 12/1/13 was $472,823,963.  The "interest" ($4,167,002 based on 10.58%) exceeded the monthly payment ($3,500,000 at 8.88%) such that the "balance outstanding" on 1/1/14 had increased.  This was to continue until December 2045 when the balance (then $803,030,054) would start to go down.)

61.     In addition,  the tenant PropCos granted Omega a security interest in each tenant's assets (as described more fully below).

62.     The 4 West PropCos entered into subleases with the OpCos, now also owned by 4 West, actually responsible for the operation of the SNFs.

#48729463 v4

63.     As required by the financing transaction, the OpCos also entered into Operator Security Agreements, pursuant to which they pledged to Omega, to secure, among other things, all of the "Obligor Group Obligations" (as defined in the Master Leases), all tangible and intangible personal property, Government Contracts and Government Accounts (to the extent not prohibited), and all additions, accessions, replacements, products and proceeds.  In return for entering into the Operator Security Agreements, the Omega landlords entered into the Master Leases and consented to the PropCop's subleases to the OpCos.

64.     Upon information and belief, the pre-closing OpCos and PropCos were not liable for all of the pre-closing obligations, in contrast to the situation post-closing.

65.     The Merger Agreement, Sale Leaseback Agreement, and Master Leases nominally closed and went effective on November 23, 2013.

66.     However, upon information and belief, the parties to the transaction knew at the outset that the deal would need to be renegotiated.

67.     For example, the parties knew that two territories covered by the Master Leases—Texas and North West—were not within the core business operations of the newly formed 4 West entities.   The parties recognized that these facilities were outside of the manageable footprint of 4 West's business and would need to be excised from the portfolio, but they nevertheless proceeded to close the transaction that included them.

68.     As described in further detail below, the deal was later renegotiated with multiple facilities ultimately being transferred back to Omega and other operators.

69.     On April 1, 2014, 4 West executed the First Amended and Restated Subordinated Promissory Note (the "First Amended Note"), whereby 4 West was to pay $11,150,000 to New Ark Mezz Holdings, LLC on or before December 30, 2016.

-37-

70.     The proceeds of the First Amended Note were to be applied by 4 West in connection with the closing of the Merger Agreement, and upon information and belief, the note was amended to push back the payment timing and increase the interest rate.

## 3.    Terms of the Master Leases

71.     All four Master Leases contained similar or identical terms, but were related to different facilities with different landlords, tenants, subtenants, and amount of "rent" due.

72.     Each Master Lease is for a term of 50 years.

73.     Upon information and belief, at the time the Master Leases were entered, Omega believed that the useful economic life of the properties was only 40 years.

74.     "Rent" payments for the life of each Master Lease are shown on a schedule titled "Amortization of Funded Amount," which also lists Omega's gross investment, carrying amount of the leased property,  unearned profit (also designated as interest), and the total amount of principal paid per month.

75.     The amortization schedule used as a basis for the deal showed that the actual "rent" could not fully satisfy the obligations at the outset of the transaction thus causing "negative amortization."

76.     The amortization schedule attached to each Master Lease provides that there is a 10.58% to 11.16% implicit rate over the term of leases, while the Omega Healthcare Investors, Inc. Form 10-K for the fiscal year ending December 31, 2016 (the "**2016 Omega 10-K**") says the Master Leases yield a 10.6% per annum over term of leases.

-38-

77.    At the beginning of the fourth Lease Year (as defined in the Master Leases), which began on January 1, 2017, Base Rent (as defined in the Master Leases) increased by 7.66% under the North West, Indiana and Texas Master Leases.

78.    For each succeeding Lease Year after the fourth Lease Year, the Base Rent was to increase by 2.5% under all four Master Leases.

79.    Pursuant to the Sale Leaseback Agreement, the purchase price for the facilities was explicitly tied to the $525 million amount of consideration under the Merger Agreement, not to the appraised value of the facilities, which was approximately $500 million. The base amount of the purchase price under the Sale Leaseback Agreement and the base amount of the merger consideration under the Merger Agreement were both $525 million, and the definition of "Purchase Price" set forth in the Sale Leaseback Agreement includes terms which themselves are defined in the Merger Agreement.

80.    Omega purchased the facilities with the specific intent to lease them back to the Debtors.

81.    Upon information and belief, the Sale Leaseback Agreement and the Master Leases were structured as they were for certain tax reasons, including Omega's status as a REIT.

82.    The Master Leases provide that "Sale Leaseback Agreement together with this lease shall be treated by the Parties for (i) all federal, state and local income tax purposes as a secured financing arrangement, and (ii) GAAP accounting purposes as a capital lease." *See* Master Leases, Art. 23.1.  Moreover, the Master Leases also provide that for tax purposes (i) the amounts paid by the Omega landlords for the acquisition of the SNFs will be treated as a loan to the Company's tenants; (ii) the Omega landlords and Company's tenants will classify and

characterize all "rent" payments as payments of principal and interest; (iii) the Company's
tenants shall continue to claim depreciation for the SNFs.  *See id.*

83.    Discussing the Master Leases in the 2016 Omega 10-K, Omega represents
that there is a risk that the Omega landlords could be found by the Internal Revenue Service *not*
to be the true owner of the SNFs allegedly acquired through the Merger and leased to the
Company through the Sale Leaseback Agreement:

> The availability to us of, among other things, depreciation
> deductions with respect to our owned facilities (which reduce our
> taxable income and the amount of our required dividend
> distributions) depends upon the determination that, for federal
> income tax purposes, we are the true owner of such facilities for
> federal income tax purposes, which is dependent on the
> classification of the leases to operators or our facilities as "true
> leases" rather than financing arrangements for federal income tax
> purposes. . . . However, no assurances can be given that the IRS
> will not successfully challenge our status as the owner of our
> facilities subject to leases, and the status of such leases as true
> leases, asserting that the purchase of the facilities by us and the
> leasing of such facilities merely constitute steps in secured
> financing transactions in which the lessees are owners of the
> facilities and we are merely a secured creditor.

2016 Omega 10-K, at 11.

#48729463 v4

84.     The Master Leases provide that the Company's tenants are responsible for all utilities, insurance, tax and maintenance payments.  *See* Master Leases, Art. 3.1, 3.4, 4.1, 7.1, 7.2.

85.     If a SNF governed by a Master Lease is destroyed by casualty or partial taking through eminent domain (or in response to a threat of eminent domain), the Tenant, i.e. the Company's tenant, bears the entire risk of loss as it has to make all repairs at its own expense, including in a partial taking situation to restore the property such that it can be used for substantially the same purpose pre-taking.  *See* Master Leases, Art. 9.1, 9.4, 10.2.  The only contribution by the Omega landlords with respect to such repairs is that it will either provide to the tenant (i) the net received insurance proceeds after certain conditions are satisfied, or (ii) the lesser of the net award from the taking or the tenant's out-of-pocket costs of restoring the SNFs. *See* Master Leases, Art. 9.4, 10.2.

86.     After condemnation or destruction of an SNF property by casualty or taking, the Master Leases do not permit the Company's tenants to abate any amount of rent, even though they will not be receiving full, or potentially, any beneficial use of the property pending the completion of the repairs or rebuilding.  *See* Master Leases, Art. 9.9, 9.10, 10.4.

87.     If a casualty or complete taking destroys or takes the entire SNF property, or the damage/extent of the taking results in the Company's tenant not being able to use the SNF for the purposes it was used for, for 120 days following the casualty event or taking, the Master Leases require the Company's tenants to submit, within 30 days after the casualty event or taking, an irrevocable, rejectable written offer (the "**Rejectable Offer**") to buy the Omega landlord's interest in the SNF.  *See* Master Leases, Art. 9.10, 10.4.  The purchase price in the Rejectable Offer must be equal to the "Facility Transfer Price" (also defined in the Master

-41-

Leases as the "Offer Price") as of a specified proposed purchase date, respectively.  *See* Master

Leases, Art. 9.10, 10.4  The "Facility Transfer Price" is approximately the current month's rent,

plus the net present value of the remaining Base Rent for the applicable SNF being sold, plus the

Omega landlord's costs and expenses of the transfer.  *See* Master Leases, Art. 1.4.  After receipt

of the Rejectable Offer, the Omega landlord has 30 days to decide whether to accept or reject the

Rejectable Offer.  *See* Master Leases, Art. 9.10, 10.4.  If the Rejectable Offer is rejected by the

Omega landlord, then the Company's tenant still has to repair the SNF at its sole expense.  *See*

*id*.

88.    This risk of loss, and obligation to pay rent when not receiving any

beneficial use of property, is further demonstrated by the Master Leases explicitly not permitting

the Company's tenants to terminate the Master Leases, or seek to abate, reduce, setoff or recoup

against the rent owed under the Master Leases, without the Omega landlord's consent.  *See*

Master Leases, Art. 2.6.

89.    Under the Master Leases, the Company's tenants have the option (the

"**Tenant Option**") to purchase the SNF properties for a nominal $10.00 during the last month of

the lease term or, if the Tenant Option is exercised after the first 40 years of the lease term but

before the last month, for the amount of the current month's rent, plus the net present value of

the remaining Base Rent, plus the Omega landlord's costs and expenses of closing the Tenant

Option.  *See* Master Leases, Art. 1.4, 12.1, 12.3, 12.4.  If the Company's tenants want to exercise

the Tenant Option, the Master Leases require them to exercise the Tenant Option for all SNF

properties and for all four Master Leases.  *See* Master Leases, Art. 12.1.

90.    After the exercise of the Tenant Option, but prior to its closing, the Omega

landlords have the ability to elect to buy out the Tenant Option by paying the tenants the fair

#48729463 v4

market value of the Tenant Option Property (as defined in the Master Leases). *See* Master Leases, Art. 12.10.

91.     Pursuant to the Master Leases, the Company's tenants granted the Omega landlords a security interest in the following property, whether then owned or subsequently acquired, to secure the payment and performance of the Obligor Group Obligations (as defined in the Master Leases):

a.   All machinery, furniture, equipment, trade fixtures, appliances, inventory and all other goods as defined in Article 9 of the Uniform Commercial Code, and any leasehold interest of the Company's tenants therein;

b.   All accounts, contract rights, general intangibles, instruments, documents, and chattel paper;

c.   All franchise, permits, licenses, operating rights, certifications, approvals, consents, authorizations and other general intangibles, including certificates of need, state health care facility licenses, and Medicare and Medicaid provider agreements, to the extent permitted by law;

d.   Unless expressly prohibited by the terms thereof, all contracts, agreements, contract rights and materials relating to the design, construction, operation or management of any improvements, including, but not limited to, plans, specifications, drawings, blueprints, models, mock-ups, brochures, flyers, advertising and promotional materials and mailing list;

-43-

e. All subleases, occupancy agreements, license agreements and concession agreements, written or unwritten, of any nature, and all right title and interest of the Company's tenant thereunder, including, without limitation, the Company's tenant's right to cash or securities deposited thereunder;

f. All ledger sheets, files, records, computer programs, tapes, other electronic data processing materials, and other documentation; and

g. The products and proceeds of the preceding listed property, including, without limitation, cash and non-cash proceeds, proceeds of proceeds, and insurance proceeds.

*See* Master Leases, Art. 24.1.

92. Each of the Master Leases was amended several times for various reasons. When SNFs leased under the Master Leases were sold, the relevant Master Leases generally were amended to reflect a decrease in rent, as well as to replace each Schedule 2, "Amortization of Funded Amount." *See* 3rd, 4th and 5th Amendments to North West Master Lease; 4th Amendment to South East Master Lease.

93. Conversely, when Omega funded renovations to the properties, the Base Rent was adjusted relative to the funded amount, including by attaching a revised Schedule 2, "Amortization of Funded Amount." *See* 3rd, 4th and 5th Amendments to South East Master Lease.

94. These Master Leases were not leases at all, but actually secured financing agreements whose unfavorable terms put Debtors on a path destined for failure.

-44-

4.      **The Debtors' Inevitable Demise**

95.     "Overleveraged from the inception," as CRO Robichaux conceded and Trey Blalock, Chief Development and Legal Officer of HCN, confirmed—with zero capital and no room for operating error or unexpected circumstances, the Debtors never had a chance to succeed.

96.     As the parties anticipated from the outset, rent increases required by the terms of the Master Leases outpaced the Debtors' growth, causing immediate financial stress.

97.     As early as the end of 2013, the Debtors reported negative stockholder equity of $2.8 million, which deficit increased to $30.7 million by the end of 2014.

98.     Although Debtors were able to limp along for a couple of years, they never gained financial footing.  As early as December 2015, Omega became very concerned with Debtors' rent coverage ratio.

99.     Unsecured debt continued to grow, which is an indication of an inability to pay debts, ultimately resulting in over $100 million of unsecured debts as of the Petition Date.

100.    As the parties anticipated from the outset of the Merger and Sale Leaseback, in the summer of 2014, mere months after the transaction closed and the Master Leases went effective, the Company, with the assistance of Omega, analyzed the portfolio of SNFs and decided to divest SNFs that were operating at a historical loss.

101.    The Company and Omega then marketed the SNFs that were covered under the Texas Master Lease.  The Company's  affiliates that were tenants under the Texas Master Lease terminated their subleases with the related OpCos and subleased the Texas SNFs to a new operator, with whom Omega had a preexisting relationship.

-45-

102.    On July 1, 2017, the Texas Master Lease and the related subleases were terminated by Omega and the Company's tenants thereunder.

103.    In the fall of 2016, the Company and Omega marketed the SNFs under the North West Master Lease, and in early 2017, the Company transitioned those SNFs to new operators.

104.    Although the Company sought to formally terminate the North West Master Lease after the transition of SNFs in early 2017, upon information and belief, the North West Master Lease has not yet been formally terminated.

**5.    Workout Period Begins**

105.    By January 2017, Debtors were unable to pay any rent due to Omega, and the parties' relationship entered what Vikas Gupta at Omega called the "Workout Period."

106.    Orianna asked Omega whether it could use its security deposit to pay rent, but Omega refused.

107.    Instead, Omega ultimately agreed to provide a working capital loan to Orianna—while trade debt continued to pile up, the Debtors borrowed money from Omega for the purpose of paying rent to Omega.

**6.    Omega Working Capital Loan**

108.    On May 2, 2017, pursuant to that certain Working Capital Loan Agreement, an Omega affiliate, OHI Asset RHO, LLC, provided the Company with an $18.8 million line of credit for working capital expenses (the "**Working Capital Loan**").

109.    At a time when the Company was insolvent, and Omega knew, or should have known, of this insolvency, Omega lent $15 million to the Company with the largest portion,

-46-

approximately $10.5 million, being used to pay various rental obligations, including unpaid real property taxes, monthly rent and security deposits.

110.    As of March 6, 2018, the Company still had an outstanding balance under the Working Capital Loan of approximately $15 million, which, again, the Company used primarily for rent and other rental obligations, as well as other operating expenses.

111.    The Company's obligations under the Working Capital Loan are secured through the Company's grant to the Omega lender of a security interest in the "Collateral" of all real property and tangible and intangible personal property serving as security for the obligations of the Company to the Omega lender or any of the Omega affiliates. *See*. Sec. 6.3. Specifically, the Company's obligations under the Working Capital Loan are also "secured by, and cross defaulted with, all guaranties, security interests, liens, subordinations, assignments and encumbrances granted previously, now or in the future by any one or more of undersigned to [the Omega lender], including, but not limited to, the guaranties, security interest, liens, subordinations, assignments and encumbrances granted pursuant to the Transaction Documents [including the Working Capital Loan, Master Leases, Sale Leaseback Agreement, and related documents] and/or from time to time hereafter granted by any of the undersigned [Company borrowers] to [the Omega lender or any Omega landlords under the Master Leases]." *See* Sec. 6.2.

112.    The Working Capital Loan does not appear to be publically disclosed in any of Omega's filings with the U.S. Securities and Exchange Commission. Additionally, while the Omega Healthcare Investors, Inc. Form 10-K for the fiscal year ending December 31, 2017 (the "**2017 Omega 10-K**") provides that Omega has not recognized any lease income from the Company from July 1, 2017 through December 31, 2017, testimony in the Company's

bankruptcy cases has been that the Company stopped paying rent to Omega in January of 2017.
*Id.* at 54.

113.    Upon information and belief, Omega will be seeking recovery for the $15
million incurred by the Company under the Working Capital Loan.

**7.      Restructuring Period Begins**

114.    By the summer of 2017, the parties agreed that a restructuring was
necessary.

115.    The Company's owners and Omega began to engage in discussions on
how to restructure the Company in a way that best protected the interests of Omega and
Company Insiders.

116.    The Insiders and Omega started to work on a term sheet in August 2017,
but it took many more months of negotiations before they agreed to the framework for a deal.
Representatives of unsecured creditors were not included in these negotiations.  The negotiations
stretched past the four-year anniversary of November 2013 closing of the LBO.

117.    On December 20, 2017, 4 West and Omega executed a Term Sheet for
Transition and Sale Transaction by and among 4 West Holdings, Inc. and Affiliates and Omega
Healthcare Investors, Inc. and Affiliates (the "**Term Sheet**").

118.    After many weeks of further negotiations, the provisions of the Term
Sheet were converted into a Restructuring Support Agreement ("**RSA**"), Settlement Agreement
by and between the Company and Omega (the "**Settlement Agreement**"), and Plan of
Reorganization (the "**Proposed Plan**").

119.    The Settlement Agreement set forth the "Transfer Transaction," which
provides for the transfer of 22 of the Company's SNFs to new operators designated by Omega.

120.    The Proposed Plan set forth the "Restructuring Transaction," whereby Omega intends to consent to the recharacterization of the Company's other SNFs and one hospice facility (the "**Restructuring Portfolio**"), such that the winning bidder at the related sale will own equity in the reorganized debtors.  The Plan Sponsor has been deemed the stalking horse bidder for the purchase of the Restructuring Portfolio with proposed total consideration of $225,000,000—$195,000,000 in cash plus  $30,000,000 in a subordinated term note.

121.    Also included with the Proposed Plan are releases to be given by the Debtors of certain potential claims against Omega, the Plan Sponsor, and their related persons.

122.    The proposed Plan Sponsor was formed on February 1, 2018, by in-house counsel for HCN Trey Blalock—the same lawyer who testified a month later on behalf of *the Debtors* at the First Day Hearings.

123.    On February 12, 2018, Louis Robichaux was appointed the Company's Chief Restructuring Officer ("**CRO**").

**8.    4 West Declared Bankruptcy**

124.    As was inevitable from the time of their overleveraged, undercapitalized formation in the wake of the LBO, the Company and its affiliated Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code on March 6, 2018 (the "**Petition Date**").

125.    The Debtors continue to operate their businesses and manage their properties as a debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**9.    Omega DIP Loan & Related Security Interests**

126.    Omega affiliate, OHI Asset RO, LLC, provided the debtor-in-possession financing (the "**DIP Loan**") to the Debtors, which was a $30 million loan.

-49-

127.    Pursuant to that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement (the "**DIP Agreement**") and the final order approving the DIP Loan, the Company granted OHI Asset RO, LLC a security interest in all assets and property (tangible, intangible, real personal or mixed) of the Debtors and their estates, whether owned or thereafter acquired.

128.    Omega does not hold a lien under the DIP Agreement, however, on the Debtors' estates' chapter 5 avoidance action or their state law equivalents.

**COUNT I**
**AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFER**
**(CONSTRUCTIVE-LBO) AGAINST THE OMEGA PARTIES**
**(11 U.S.C. §§ 544 and 550 and 6 Del. C. § 1304(a)(2)**
**and/or Md. Code Ann., Com. Law §§ 15-204 through 15-206)**

129.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

130.    Under Section 544(b) of the Bankruptcy Code, any debtor may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is avoidable "under applicable law" by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code (or is not allowable only under section 502(e)).

131.    The phrase "under applicable law" has been interpreted to include state fraudulent transfer laws.

132.    In connection with the LBO, Debtor PropCos transferred their real property assets to certain Omega subsidiaries.

133.    In connection with the LBO and to secure the "Obligor Group Obligations," Debtor OpCos pledged to Omega all tangible and intangible personal property, Government Contracts and Government Accounts (to the extent not prohibited), and all additions, accessions, replacements, products and proceeds.

#48729463 v4

134.    In connection with the LBO, Debtor HoldCos entered into a Pledge Agreement, pledging 100 percent of the equity securities of their subsidiaries (i.e., other debtors) to Collateral Agent to secure the Obligor Group Obligations.

135.    These transfers constituted transfers of interests in the property of Debtors.

136.    At the time of the transfers, the Debtors had creditors with allowable unsecured claims for liabilities, which remained unsatisfied as of the Petition Date.  Such creditors included the Internal Revenue Service, which had certain allowable unsecured claims against the Debtors that remained unpaid on the Petition Date.

137.    The transfers were made in exchange for less than reasonably equivalent value.

138.    The Debtors were insolvent at the time of, or became insolvent as a result of, the transfers.

139.    At the time of the LBO, the Debtors were engaged in or were about to engage in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction.

140.    At the time of the LBO, the Debtors believed or reasonably should have believed that they would incur debts beyond their ability to pay such debts as they became due.

141.    By virtue of the foregoing, the transfers were fraudulent transfers avoidable under applicable state law, and Plaintiff is entitled to avoid the transfers.

142.    The transfers should be avoided and their value recovered from the Transferees.

#48729463 v4

## COUNT II
## DECLARATORY JUDGMENT OF PROPER
## CHARACTERIZATION OF THE MASTER LEASES
## (28 U.S.C. § 2201)

143.    Plaintiff repeats and realleges each preceding allegation as if fully set forth

herein.

144.    This claim for relief arises under the Federal Declaratory Judgement Act,

28 U.S.C. §2201.

145.    Upon information and belief, Defendants contend that the Master Leases

are within the meaning of section 365 of the Bankruptcy Code, under which master leases

Defendant is the lessor and the Company is the lessee.

146.    However, none of the Master Leases are "leases" within the meaning of

Bankruptcy Code section 365.  Instead, based on their characteristics, the Master Leases are

actually secured financing agreements.

147.    Therefore, Plaintiff seeks a declaratory judgment that the Master Leases

are actually secured financing agreements, not "leases" as that term is used in section 365 of the

Bankruptcy Code and that Defendant is a secured creditor of the Company, not its lessor.

## COUNT III
## AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFER
## (CONSTRUCTIVE-WORKING CAPITAL LOAN) AGAINST THE OMEGA PARTIES
## (11 U.S.C. §§ 544, 548(a)(1) and 550 and/or Md. Code Ann., Com. Law §§ 15-204 through
## 15-206)

148.    Plaintiff repeats and realleges each of the allegations set forth above as if

fully set forth herein.

149.    Under Section 544(b) of the Bankruptcy Code, any debtor may avoid any

transfer of an interest of the debtor in property or any obligation incurred by the debtor that is

#48729463 v4

avoidable "under applicable law" by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code (or is not allowable only under section 502(e)).

150.    The phrase "under applicable law" has been interpreted to include state fraudulent transfer laws.

151.    In connection the Omega Working Capital Loan, certain Debtor OpCos transferred security interests to the Omega lender, OHI Asset RO, LLC, in all real property and tangible and intangible personal property serving as security for the obligations of the Company to Omega affiliates.

152.    These transfers constituted transfers of interests in the property of Debtors.

153.    At the time of the transfers, the Debtors had creditors with allowable unsecured claims for liabilities, which remained unsatisfied as of the Petition Date.

154.    The transfers were made in exchange for less than reasonably equivalent value.

155.    These transfers were made within two years of the Petition Date.

156.    The Debtors were insolvent at the time of, or became insolvent as a result of, the transfers.

157.    At the time of the Working Capital Loan, the Debtors were engaged in or were about to engage in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction.

158.    At the time of the Working Capital Loan, the Debtors believed, or reasonably should have believed, that they would incur debts beyond their ability to pay such debts as they became due.

-53-

159.    By virtue of the foregoing, the transfers were fraudulent transfers avoidable under applicable state law, and Plaintiff is entitled to avoid the transfers.

160.    The transfers should be avoided and their value recovered from the Omega Parties.

## COUNT IV
## DECLARATORY JUDGMENT OF EXTENT OF OMEGA'S SECURED INTEREST
## (28 U.S.C. § 2201)

161.    Plaintiff repeats and realleges each preceding allegation as if set forth herein.

162.    This claim for relief arises under the Federal Declaratory Judgement Act, 28 U.S.C. §2201.

163.    Pursuant to its security agreements related to the Master Leases, Working Capital Loan and DIP Agreement, Omega does not hold a lien on (i) the payment to the Company's bankruptcy estates for the releases to be provided under the Proposed Plan, (ii) value recovered through avoidance actions; (iii) value recovered through unidentified tort actions; and (iv) the goodwill generated by the Company after the Petition Date.  As such, any value gained by the Debtors' estate through these four avenues should not be earmarked specifically for Omega, but should go to the benefit of the Company's general unsecured creditors.

164.    Plaintiff therefore seeks a judgment declaring that Omega does not hold a lien on (i) the payment to the Company's bankruptcy estates for the releases to be provided under the Proposed Plan, (ii) value recovered through avoidance actions; (iii) value recovered through unidentified tort actions; and (iv) the goodwill generated by the Company after the Petition Date.

WHEREFORE, Plaintiff respectfully requests judgment for the Company and against the Defendant, and for the Court to enter an order as follows:

#48729463 v4

A.      Avoiding the constructively fraudulent transfer against the Omega Parties related to the LBO;

B.      Recovering the value of the avoided transfers made to Omega in connection with the LBO;

C.      Declaring that the Master Leases are secured financing agreements, not "leases" under section 365 of the Bankruptcy Code, such that the Defendants are secured creditors, not the Company's lessor;

D.      Avoiding the constructively fraudulent transfer against the Omega Parties related to the Working Capital Loan;

E.      Recovering $15 million on behalf of the avoided Omega fraudulent transfer related to the Working Capital Loan;

F.      Declaring that Defendant holds no lien on the payment to the Company's bankruptcy estate for the releases given under the Proposed Plan, on avoidance actions and unidentified tort claims, or on goodwill generated after the Petition Date;

G.      Awarding damages to the Company for each of the foregoing wrongs in an amount to be determined at trial;

H.      Awarding attorneys' fees, legal costs, interest and other expenses incurred by Plaintiff in connection with this action; and

I.      Granting any further relief the Court deems just and proper.

#48729463 v4